**UNITED STATES of America, Plaintiff,**

v.

**Jose Antonio LOPEZ–CACERES, Neftali Velez–Ramos, Defendants.**

**No. Crim. 98–0292CCC.**

United States District Court, D. Puerto Rico.

Dec. 7, 1999.

Guillermo Gil, U.S. Attorney, Desiree Laborde–Sanfiorenzo, Assistant U.S. Attorney, San Juan, PR, for plaintiff.

Francisco Dolz–Sánchez, San Juan, PR, Efrén Irizarry–Colón, Arecibo, PR, for defendants.

## ORDER

CEREZO, District Judge.

Presently before the Court is a request by the government that certain statements against penal interest made by co-conspirator Neftalí Vélez–Ramos be admitted pursuant to Federal Rule of Evidence 804(b)(3) against his alleged accomplice, given the unavailability of the former as a trial witness.

Defendant Vélez–Ramos pled guilty on November 12, 1999 to a one-count indictment of conspiring with defendant José Antonio López–Cáceres in the adulteration of milk. During the Court's F.R.Crim.P. 11 colloquy, he described the actions taken to adulterate the milk with the milk truck drivers to whom he paid with cash allegedly obtained from defendant López–Cáceres, owner of the dairy farm. The statements made during the change of plea hearing were the last in a chain of events which started with his appearance on December 10, 1999 at the Food and Drug Administration Office of Criminal Investigation, San Juan Office, before Special Agent Eluit Cruz–González. During a one-hour interview, at which task force agent lieutenant Ismael Morales was also present, he made the following statement, which the government has offered in evidence pursuant to the hearsay exception of declarations against penal interest:

> He dealt "bregaba," adulterated the milk with water and salt with several drivers while he was working at the milk room. Before the milk truck arrived at the farm, Tony López gave him thirty to forty dollars for the adulteration. He never talked about milk adulteration with Tony López. He always requested to the drivers 100 or 200 liters of water depending of how much milk was produced. Not all the drivers "bregaban" participated in the adulteration of milk with water and salt. He did not recall the names of the drivers that dealt with him, however he identified them through

photographs. He identified Tres Monjitas drivers Adrian Colón, Miguel Torres and Edwin Otero.

Shortly thereafter, on December 17, 1998, Mr. Neftali Vélez–Ramos was summoned before the grand jury to testify. The transcript of that hearing reflects that he was advised that he was the target of a grand jury investigation on the adulteration of milk in Puerto Rico. The government has offered multiple statements made by Mr. Vélez–Ramos before the grand jury, some which are self-inculpatory, other which implicated co-defendant López–Caceres, and still others neutral in content (see e.g. Transcript of grand jury proceedings of December 14, 1998, p. 13, line 22 through p. 14, line 7).

The suppression hearing statements offered merely refer to his report of interview statements as being correct.

Mr. Vélez–Ramos became an unavailable witness after being summoned by the government to testify at trial, refusing to do so based on his Fifth Amendment privilege, and thereafter provided immunity under 18 U.S.C. §§ 6002 and 6003. Given his continuous refusal to testify after the grant of immunity, the Court after holding a hearing on November 30, 1999 summarily determined pursuant to F.R.Crim.P. 42(a) the he was in contempt of Court. Thereafter, the prosecution requested that all of the statements outlined above be admitted against co-defendant López–Caceres. The Court denied the request with a verbal ruling made in open court. The government, in a motion for reconsideration (docket entry 100) based primarily on *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994) and *Unites States v. Barone*, 114 F.3d 1284 (1st Cir.1997), relied on the views expressed by Justice Scalia in his concurring opinion in *Williamson* that "a declarant's statement is not magically transformed from a statement against penal interest into one that is inadmissible merely because the declarant names another person or implicates a possible codefendant." 114

S.Ct. at 2438. It argued that Vélez–Ramos statements are truly self-inculpatory under the *Williamson* standard and that the circumstances in which they were made as well as other evidence in the case provides the required particularized guarantee of trustworthiness to justify their introduction. During oral argument no mention was made of a subsequent Supreme Court case, *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 1892, 144 L.Ed.2d 117 (1999), where the question presented was defined as "whether the accused's Sixth Amendment right to be confronted with the witnesses against him was violated by admitting into evidence at his trial a non-testifying accomplice's *entire* confession that contained some statements against the accomplice's penal interest and others that inculpated the accused."

The analysis in *Lilly*, contrary to *Williamson* where the same issue was examined without reaching the Confrontation Clause question, was based precisely on what it refers to as "meaningful Confrontation Clause analysis." *Id.*, at 1895. Invoking past and recent cases interpreting the Confrontation Clause, the Court rejected a restrictive reading of the Clause which could throw the criminal process back to the abusive practice of prosecuting criminal defendants through the presentation of ex-parte affidavits, without the affiant ever being produced at trial. *Id.* at 1894, 1900. It cited the three situations in which declarations against penal interest are offered into evidence in criminal trials: (1) as voluntary admissions against the declarant, (2) as exculpatory evidence offered by a defendant who claims that it was the declarant, not he, who committed the crime and (3) as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant. This case, like *Lilly*, involves statements in the third category.

Rejecting the conclusion reached by the Supreme Court of Virginia that these statements were admissible under the firmly rooted hearsay exception of declara-

tions against penal interest, the Court held that "accomplices' confessions that inculpate a criminal defendant are not within a firmly rooted exception to the hearsay rule as that concept has been defined in our Confrontation Clause jurisprudence." *Id.* at 1899. The Court observed that "[i]t is clear that our cases consistently have viewed an accomplice's statements that shift or spread the blame to a criminal defendant as falling outside the realm of those "hearsay" exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability." *Id.* at 1898. At footnote 5 of the opinion, the Court reviewed its Confrontation Clause jurisprudence starting with *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *Cruz v. New York,* 481 U.S. 186, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987), *Gray v. Maryland,* 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998) and *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986), and stated that all these cases were "... all premised, explicitly or implicitly, on the principle that accomplice confessions that inculpate a criminal defendant are not per se admissible (and thus necessarily fall outside a firmly rooted hearsay exception), no matter how much those statements also incriminate the accomplice ...," reaffirming in said footnote that it "... ruled in Bruton, Cruz, and Gray that such equally self-inculpatory statements are inadmissible against criminal defendants." *Id.* 1899, n. 5.

Justice Breyer in his concurring opinion reaffirms this, stating "... why should we, like Walter Raleigh's prosecutor, deny a plea to 'let my Accuser come face to face,' with words (now related to the penal interest exception) such as, 'The law presumes, a man will not accuse himself to accuse another'?" *Id.* at 1902.

Although category three statements are not admissible *per se* under the declaration against penal interest exception, the Court recognized that statements of an unavailable witness that are "... incontestably probative, competent, and reliable ..." in situations where the "... declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility ..." would be admissible under the Sixth Amendment residual trustworthiness test. *Id.* at 1900.

The *Lilly* court analyzed all of the asserted guarantees of trustworthiness advanced by the Commonwealth of Virginia and found that the statements were still not sufficiently reliable. Before assessing the different indicia of reliability proffered by the Commonwealth, the Court reminded of the unlikeliness that "... the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old ex parte affidavit practice—that is, when the government is involved in the statements production, and when the statements describe past events and have not been subjected to adversarial testing." *Id.* at 1900.

■ Relevant to our analysis in this case is the Court's refusal to allow the prosecution to bootstrap on the trustworthiness of other evidence requiring instead that "... 'the hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.'" *Id.* at 1901. The government has claimed that the inference flowing from evidence that defendant's farm did not have a surplus in the year 1993 are guarantee of trustworthiness. Aside from the fact that there is controversy as to the accuracy of that inference flowing from the government's own evidence, this argument goes against the Court's admonition that the trial court not bootstrap hearsay statements to implicate a co-defendant based on other evidence. The government has also offered lukewarm inferences, such as that the dairy farm owner was the only one to benefit economically and that on declarant's mea-

ger salary he could not have paid the truck drivers, which are equally unavailing under the Court's prohibition outlined above.

Nor does declarant's claimed consistency in that he made the same statement implicating defendant before the law enforcement agent, the grand jury and the Court ". . . enhanced his statements' reliability to the level necessary for their untested admission." *Id.* at 1901. If he places the blame on someone else or did so to mitigate his own, the fact that he so stated time and again does not make declarant's truthfulness so clear that cross examination would be of marginal utility.

The claim that declarant's statements under oath before the Court during his change of plea hearing are a guarantee of trustworthiness falls to take into account the complexity and multiplicity of factors that coincide at a stage in a criminal process when a defendant self convicts. If ever there is a motive to cast blame on others or to mitigate one's own culpability, the most dangerous point in time is at a self-conviction hearing where a defendant is awaiting the imposition of sentence. Among other factors, his role in the offense is important to the sentence yet to be imposed. Additionally, ex-parte statements made at such a hearing which are offered at trial inherently bring with them the danger of guilt by association. This is precisely why jurors are not told that non-testifying defendants have pled guilty.

Finally, we note that Mr. Vélez–Ramos' statements were all made to government agents or to the Court and that these statements which implicate the co-defendant in milk adulteration are all ex-parte declarations none of which can be classified as incontestably probative and reliable. His statements that Mr. López–Cáceres would give him thirty to forty dollars for the adulteration were simultaneously given with the statement that he never talked about milk adulteration with Mr. López–Cáceres.

For the reasons stated, the United States of America's Memorandum of Law Regarding the Admissibility of Prior Consistent Testimonies of an Unavailable Witness to be Used at Trial Against a Co-conspirator (**docket entry 100**) is DENIED.

SO ORDERED.

## ORDER

After issuing its Order dated December 6, 1999 denying the Motion for Reconsideration to allow ex-parte statements made by co-defendant Neftali Vélez–Ramos against his alleged accomplice, the government requested a second reconsideration in open Court. This second motion for reconsideration is based on a report of interview of Pablo Vélez–Roldán, a cousin of defendant Vélez–Ramos. This interview was conducted by case agent Cruz González on December 6, 1999. Vélez–Roldán narrates that his cousin went to see him the Friday before the contempt hearing of November 30, 1999 "looking for advice or an opinion regarding his testimony against the "patrón" Tony López." According to the memorandum of interview, Vélez–Ramos and Vélez–Roldán "assessed the situation and he advised Vélez–Ramos to say, sustain and maintain everything that he had declared or said to the agents and in the hearings." According to Vélez–Roldán, his cousin agreed he would testify against his employer, and when he found out that his cousin had refused to testify, "he knew that something was not right, that something was very strange." The memorandum of interview states at page 2 that during Velez Ramos and his cousin's conversation that day, he stated "that Tony López provided him the money to pay the drivers."

The government requests that his statement implicating co-defendant López–Cáceres be admitted under Federal Rules of Evidence 804(b)3 since, contrary to his prior statements made either to law enforcement or to judicial officers, this last one was made to a cousin.

These statements are not independent of the judicial process in which Mr. Vélez–Ramos is involved. He made them to a cousin, but the elements of spontaneity and trustworthiness that would attach to statements made to a relative are defeated by the fact that they were made in a context of his mental process of determining whether or not to testify. Faced with the possibility of contempt and imprisonment, there is no guarantee of trustworthiness of statements implicating defendant made during that decision-making process. Having decided to testify against López–Cáceres, the statements implicating the latter do not offer the indicia of reliability and special guarantee of credibility required by *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999), which could dispense with the test of cross-examination. To hold otherwise would constitute a meaningless Confrontation Clause analysis.

For the reasons stated, the government's second motion for reconsideration is DENIED.

SO ORDERED.