UNITED STATES,

v.

Luis Angel FLORES, Victor Laboy, Edgardo Colon, Wilberto Colon, Antonio Santiago, Roberto Pagan, and John Doe, Defendants.

No. CR. 1:00CR10029–NG.

United States District Court, D. Massachusetts.

June 27, 2002.

William F. Sinnott, United States Attorney's Office, John A. Wortmann, Jr.,

U.S.Attorney's Office, Boston, MA, for U.S.

Matthew H. Feinberg, Feinberg & Kamholtz, Jonathan Shapiro, Stern, Shapiro, Weissberg & Garin, James H. Budreau, Oteri, Weinberg & Lawson, John F. Palmer, Law Office of John F. Palmer, P.C., Boston, MA, Stephen J. Wright, Lawrence, MA, Anthony K. Ortiz, Lawrence, MA, James M. Doyle, Carney & Bassil, Boston, MA, Steven J. Brooks, Charleston, MA, Frank A. Libby, Jr., Kelly, Libby & Hoopes, PC, Boston, MA, Evan Slavitt, Gadsby & Hannah LLP, Boston, MA, for defendants.

### SENTENCING MEMORANDUM

GERTNER, District Judge.

## I. INTRODUCTION

In 1999, the Federal Bureau of Investigation ("FBI") initiated an investigation of the Latin Gangsta' Disciples ("LGD"), allegedly a street gang operating out of Lawrence, Massachusetts. The investigation began with intelligence gathering from law enforcement sources. Then, using a number of cooperating witnesses ("CWs"), the FBI made controlled purchases of heroin and cocaine (both crack and powder).

Significantly, in September and October of 1999, the FBI, through a CW who consented to both wearing a wire and to allowing the installation of a camera in the hotel room he rented, obtained videotapes of several actual meetings of the LGD.[1]

In addition, all purchases by CWs [2] were surveilled, and nearly all were recorded using audio recording equipment.[3] Between June 29, 1999, and January 12, 2000, CWs made seventeen purchases of varying amounts of heroin from the defendants: Louis Angel Flores (a/k/a "T–Roc"), Victor Laboy (a/k/a "Papito Boccero"), Edgardo Colon (a/k/a "Galdi"), Wilberto Colon (a/k/a "Bebe" and "Flaco"), Antonio Santiago (a/k/a "Pinchy"), Roberto Pagan (a/k/a "Peroxide"), and Kenny Cruz. Additional heroin and drug paraphernalia were seized from Antonio Santiago at the time of his arrest on January 30, 2000. All told, the defendants sold 108.44 grams of heroin to government CWs.

The government, however, sought to prove more than the distinct amounts associated with each defendant (the "controlled" purchases). Using historical evidence, the statements of defendants during the purchases and in recorded meetings, and admissions by non-cooperating codefendants at their sentencing (notably Pagan and Cruz), the government sought to prove that each defendant was responsible for 1–3 kilograms of heroin distribution.

Defendants Flores, Wilfredo Colon, Edgardo Colon, Santiago, Cruz, Laboy, and

1. Victor Laboy, in a motion in which all other defendants joined, moved to suppress the fruits of that videotaping. The motion was denied. Laboy pled guilty to the substantive charges. While he preserved his rights to challenge the videotaping that challenge is irrelevant in a sentencing proceeding. *See, e.g., United States v. Valencia–Lucena*, 988 F.2d 228, 232 (1st Cir.1993) (citing U.S.S.G. § 6A1.3(a)) ("At sentencing, the district court may consider 'relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.' "). In any event, the consent of the CW who had rented the hotel room that was to serve as the site of the meeting, and who remained throughout the meeting, was sufficient to legitimize the videotaping for constitutional purposes.

2. I refer generically to the CWs. The defendants were provided with discovery, including the names of the CWs. Moreover, one CW, Lawrence Guzman, testified at the sentencing hearing.

3. CWs wore transmitters that enabled law enforcement agents to listen to the conversations as they were taking place.

Pagan were charged in a superceding indictment with conspiracy to distribute heroin in violation of 21 U.S.C. § 846(a)(1)(count 1s)(all defendants), distribution of heroin in violation of 21 U.S.C. § 841(a)(1) (counts 2s–6s, 9s–18s)(all defendants), aiding and abetting the distribution of heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (counts 7s–8s)(Edgardo Colon and Santiago) and felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (count 19s)(Flores) and possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (count 20ss)(Santiago). The government also filed a notice of "applicability," announcing that count one involved more than 100 grams of heroin under 21 U.S.C. § 841(b)(1)(B)(i).

## II. PROCEDURAL HISTORY

On January 19, 2001, Kenny Cruz pled guilty to conspiracy to distribute heroin. At his plea colloquy and again at sentencing, Cruz adopted the government's version of the facts. He distributed 100 "bundles" of heroin per day, where each "bundle" was the equivalent of .23 grams. For the month of January 2000, Cruz agreed that he was responsible for 750 grams.

Significantly, Cruz indicated that he worked for Edgardo and Wilfredo Colon, using Edgardo's pager to fill orders, and distributing the heroin which Wilberto had obtained. He further delegated distribution responsibilities and the pager to Pagan. He was sentenced to 60 months on counts 1 and 18 of the superseding indictment.

On May 29, 2001, Roberto Pagan pled guilty. Pagan agreed with Cruz's account—that he too had distributed heroin with Cruz and the Colon brothers, that he and Cruz were distributing approximately 100 bundles a day for the Colon brothers. Pagan, however, participated in the business of heroin distribution for a longer period than Cruz. From early fall of 1999 until January of 2000 (approximately 4½ months), he distributed 30 bundles per day. Pagan agreed that he was responsible for at least 1000 grams of heroin [4]—the 30 bundles per day during the period from the fall of 1999 until January 31, 2000, he personally distributed, and the additional weight of the heroin distributed by the other LGD members with whom he was associated (the Colon brothers and Cruz).

On June 4, 2001, Santiago pled guilty to both the substantive and the conspiracy counts, taking responsibility for the distribution of drugs by the other co-conspirators named in the indictment.

The remaining defendants, Flores, Laboy, Edgardo Colon, and Wilberto Colon, indicated that they would be willing to plead guilty to the substantive counts of distribution with which they were charged, but wished to preserve their right to contest the drug amounts in the conspiracy charge. On October 1, 2001, I entered an order allowing severance of the conspiracy charges from the substantive charges. See United States v. Colon, 165 F.Supp.2d 67 (D.Mass. Oct.5, 2001). Santiago sought to withdraw his plea ostensibly to bring his case in line with his codefendants—i.e., to enable him to plead solely to the substantive counts, and litigate the conspiracy amounts. I denied the motion.

Between October 9 and October 18, 2001, Flores, Laboy, Edgardo Colon, and Wilberto Colon pled guilty to the substantive distribution counts.

---

**4.** Indeed, the amount attributable to Pagan alone would be equal to at least 1000 grams of heroin.

By the end of October of 2001, all defendants had entered pleas of guilty. Accordingly, I asked the United States Probation Office ("Probation") to draft an omnibus version of the offense, applicable to all defendants, and scheduled their sentencing hearings for the same two day period. I did so in order to make certain that my rulings with respect to each defendant's role in the offense and with respect to the quantity of drugs attributable to each defendant were consistent.[5]

Probation did so, concluding that the defendants Flores, Wilberto Colon and Ed-

gardo Colon, Laboy, and Santiago were each responsible for between 1 and 3 kilograms of heroin. With the exception of Flores, who is a career offender under U.S.S.G. § 4B1.1 and 21 U.S.C § 851,[6] Probation concluded that each has a base offense of 32 under the United States Sentencing Guidelines. I agreed.

I first address the issues that are the same for Flores, Santiago, Laboy, Edgardo Colon, Wilberto Colon—notably drug quantity and role in the offense. I will then address issues specific to each defendant.

---

5. The guidelines do not permit a departure from guidelines sentences merely for the purpose of redressing disparate sentences as between co-defendants in a single case. Nevertheless, there may be unjustified disparities in sentencing between codefendants, which the court may remedy through departure, as the court in *United States v. Meza*, 127 F.3d 545, 549 (7th Cir.1996), noted:

> Contrary to both parties' assumptions, a disparity in sentences between co-conspirators is not automatically a sentencing factor to consider. There are two types of disparities: justified and unjustified. A justified disparity is one that results from the proper application of the Guidelines to the particular circumstances of a case. This type of disparity can never be a basis for departure from the Guidelines' sentencing range because it is the application of the Guidelines that created the disparity in the first place....
>
> An unjustified disparity, however, is potentially a sentencing factor to consider because "[t]he goal of the Sentencing Guidelines is, of course, to reduce ·unjustified disparities." *Koon[ v. U.S.]*, 518 U.S. at 81, 116 S.Ct. [2035] at 2053[, 135 L.E.2d 392 (1996)]. An unjustified disparity is one that does not result from a proper application of the Guidelines. In other words, it is a disparity in sentences that cannot be explained by a comparison of each defendant against the Guidelines as a set of rules. For unjustified disparities, the sentencing court should apply the three step process described supra to determine whether a defendant merits a departure downward in his sentence so that the federal courts may

provide "the evenhandedness and neutrality that are the distinguishing marks of any principled system of justice." *Id.*

Dicta in the decision, which suggested that unjustified disparities were always the basis for a departure, were subsequently modified in *United States v. McMutuary*, 217 F.3d 477 (7th Cir.2000) (en banc). *But see United States v. Garza*, 1 F.3d 1098, 1100 (10th Cir.), cert. denied, 510 U.S. 1018, 114 S.Ct. 617, 126 L.Ed.2d 581 (1993) ("[N]either Congress nor the Commission could have expected that the mere fact of a difference between the applicable guideline range for a defendant than that of his codefendant would permit a departure, either because the difference was too large or too small. The Congressional objective was to eliminate unwarranted disparities nationwide.") (quoting *United States v. Joyner*, 924 F.2d 454, 460 (2d Cir.1991)).

Were I to find that different defendants who worked side by side, with identical roles, were responsible for distributing different drug quantities, and different sentences resulted, the disparity between the sentences of the two could well be seen as unjustified. I adopted the procedure described above to avoid this result.

6. Flores had 26 criminal history points, at least five of which were predicates for a determination of career offender status. Under U.S.S.G. § 4B1.1, his base offense level is determined with reference to the statutory maximum penalty for the underlying offense and his criminal history is automatically set at VI. As such, the drug weight calculations were largely irrelevant to the outcome of his sentence.

## III. DRUG AMOUNTS [7]

While I am not obliged to find facts based on the "clear and convincing" standard, *see United States v. Lombard*, 102 F.3d 1, 4 (1st Cir.1996), I nevertheless made the findings I describe below under either standard.

### A. Legal Standard

The Sentencing Guidelines place singular importance on the quantity of drugs for which the defendant should be held responsible. In effect, drug quantity is used as a proxy for culpability. There are times when that approach has given this Court—as well as others—pause, when, for example, a street dealer is held responsible for the drugs distributed by others over whom he had no control, whose activities he was only vaguely aware of. But there are also cases when the drug quantity proxy is appropriate. This is such a case. Drug quantity here more than matched the defendants' culpability for drug distribution activities. I make the findings described below with respect to drug quantity, even applying the most rigorous "relevant conduct" standard, the one most attentive to concerns about extending vicarious liability for drug weights to undeserving participants.

#### 1. The Guidelines' Standard for Holding One Defendant Accountable for the Drug Distribution Activities of Another

The drug quantity tables mandate a sentence increase for each additional amount of drugs included in the defendant's "relevant conduct." Relevant conduct includes the acts of the defendant, but it also includes the acts of others. In the latter category, a defendant is held responsible for other co-conspirators' "reasonably foreseeable" acts in furtherance of "jointly undertaken criminal activity." U.S.S.G. § 1B1.3–(a)(1)(B).[8]

As one commentator notes:

> Drug distribution is by definition a conspiratorial crime. In the case of heroin and cocaine, each seller knows that every transaction requires an extensive network of importers and distributors handling large quantities. If mere foreseeability were the only limitation, any street-level crack seller could be held responsible for hundreds of grams handled by the chain of suppliers above him. The only concepts deployed so far to avoid this absurd result are the definition of conspiracy and the test of "jointly undertaken" activity that limits relevant conduct at sentencing. . . .

Stephen J. Schulhofer, *Excessive Uniformity—And How to Fix It*, 5 Fed. Sent. Rep. 169, 170 (1992).

■ Indeed, under the Guidelines' standard, mere knowledge of the activities of another is not enough to make a defendant liable for that dealer's other's activities. *See United States v. Jones*, 965 F.2d 1507, 1517 (8th Cir.1992) ("Simply because a defendant knows that a dealer he works with sells large amounts of drugs to other people does not make the defendant liable for the dealer's other activities.")

---

7. This memorandum supplements the information provided in the presentence reports of each of the defendants. The record is voluminous, as are the reports. I summarize my findings on drug amounts, but explicitly adopt the fact findings in the presentence reports.

8. "In the case of jointly undertaken criminal activity, subsection (a)(1)(B) provides that a defendant is accountable for the conduct (acts and omissions) of others that was both:

> i) in furtherance of the jointly undertaken criminal activity; and

> ii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3 (App. Note 2).

Rather, the Guidelines expressly limit the responsibility of each participant to the scope of *his own agreement. See United States v. Edwards,* 945 F.2d 1387 (7th Cir.1991).[9] There may well be instances in which the defendant is convicted of being a member of a broad conspiracy, a conspiracy which distributed large amounts of drugs, but is held responsible at sentencing for a smaller amount because he only agreed to jointly undertake the distribution of that amount.

The Second Circuit, for example, found that the lower court erred in considering the activities of all of the employees of a fraudulent telemarketing company because those activities were not "jointly undertaken" within the meaning of the Guidelines. Rather, the court should have considered whether there was a pooling of profits and resources, the degree to which the success of one participant was tied to that of other actors, assistance in both designing and executing the illegal scheme, role the defendant agreed to play in the operation. *United States v. Studley,* 47 F.3d 569 (2d Cir.1995). Applying these criteria the court concluded that the defendant could

not be held responsible for the activities of the larger group.

In the light of these concerns, I evaluated each defendant's role in two ways. First, I looked critically at the defendant's relationship to the LGD gang, and then, the gang's relationship to the drug conspiracy. As described below, I concluded that the LGD was cohesive and hierarchical, and that drug transactions were intimately tied up in the business of the gang.[10] Moreover, with the exception of Pagan, Cruz, and Wilberto Colon, this prosecution has focused entirely on the leadership of LGD, not mere members in the chain of command. These individuals were not just present at the recorded gang meetings at which drug dealing was discussed; they played the role of "Lord" or "President," in the case of Flores, or his "Captains," in the case of Laboy, Santiago, and Edgardo Colon.

Second, to avoid any possibility of falling into the pitfalls of the cases described above, placing too much emphasis on gang activities per se rather than the activities that the defendants "jointly undertook," I also looked at the particular transactions

---

9. The Guidelines note that "the scope of the criminal activity jointly undertaken by the defendant ('the jointly undertaken criminal activity') is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." U.S.S.G. § 1B1.3 (App. Note 2).

10. I made different findings in the case of *United States v. Lacy,* 99 F.Supp.2d 108, 113–14 (D.Mass.2000). I adopted the findings of the Probation Department and concluded:

> [The] Castlegate ["gang"] is far less structured than most gangs or criminal enterprises. There is no formal hierarchy or chain of command to the gang, and the leadership was chosen very informally. The leadership often depended on the person's age, criminal history, access to drugs, whether or not they were incarcerated at the time, and they could not be addicted to

drugs. Additionally, members and associates of Castlegate do not wear specific colors or symbols that signify membership or allegiance and there is no formal initiation process ...

> Thus, I concluded that the most one could say is that the people involved "hung out" together, and when they did, "sold drugs." Moreover, while they "occupied a turf that they collectively protected from other people," there were no rules, no assigned roles or responsibilities. In that setting, the absence of any overarching organization, the fact that each competed for sales and maintained his own supply was significant. *Id.*

> With LGD, as I describe above, there were rules, assigned roles, a formal meeting structure, an initiation ritual, joint sources of supply, and the requirement that all who deal on the "turf" pay into a "fundle," a form of tribute.

in which each of the defendants was involved, without reference to the gang relationships.

■■■ After substantial briefing, three days of hearings, and numerous exhibits including video and audiotapes, and investigative reports, I concluded that the defendants Flores, Laboy, Santiago, Edgardo Colon, and Pagan were responsible for the distribution of 1–3 kilos of heroin. Indeed, on this record, by whatever measure, that estimate of drug quantity is a conservative one.

## 2. Applying the "Jointly Undertaking" Standard to the LGD

As I noted above, one concern of the case law is that an individual will be held responsible for large quantities of drugs merely by virtue of his membership in a gang, even if he had not "jointly undertaken" to distribute that amount. In *United States v. McCain*, No. 95 CR 509, 1996 WL 616635 (N.D.Ill. Oct.21, 1996), for example, the court refused to attribute the large quantities of drugs distributed by low ranking members of the LGD notwithstanding the cohesiveness and organizational structure of the gang. It was, the *McCain* court concluded, "unreasonable for a large, highly organized drug conspiracy to entrust extensive knowledge of the scope and volume of the conspiracy to large numbers of low ranking members." Rather, the inquiry should be a "detailed inquiry regarding each defendant's knowledge of the scope of the organization and the volume of its business." *Id.* at *4.

The defendants here are not at all like the defendants in *McCain*. These are not the small street dealers, or "low ranking members," way down the chain of command, wrongly held responsible for the

distribution activities of their superiors. These men were in leadership positions in the LGD, and the gang under their active tutelage was intimately tied into the distribution of drugs in Lawrence.

Four meetings of the gang were videotaped, occurring between September 12, 1999 and October 24, 1999, providing a rather extraordinary window into the workings of the LGD. Present at all four of the meetings was Santiago, Edgardo Colon and Laboy. Flores, although the acknowledged leader of the Gang, attended only one.[11] The meetings began with prayers and oaths. The defendants were active participants, reflecting their leadership role, or were referred to by others as the leaders of the organization.

After the prayers and oaths, there was a recitation of gang-related business such as feuds with rival gangs, the distribution of guns, and—quite explicitly—the business of heroin distribution. From the tapes, it is clear that the leadership of the gang—these defendants—sought to keep control of the activities on their "turf," including the drug distribution. Manny Rivera[12] says to Edgardo Colon, "you ... T–roc [Flores], Pinchy [Santiago] and Fucking Bocerro [Laboy] ... you niggers are the ones running this.... you niggers supposed to communicate at all times and let each other know what's going on ...." At another point, Flores, the Captain, says: "If anything happens, nigger, I want it brought to me ... if not brought to me, brought to one of the heads, Pinchy [Santiago], Galdi [Colon], or Bocerro [Laboy]."

Moreover, they plainly pooled their resources in a number of ways: Members were obliged to pay a portion of the proceeds of drug distribution on the gang's

---

**11.** It appears he was "ill" when the other meetings were held, an "illness" brought about by his severe addiction.

**12.** Rivera was charged in a separate indictment alleging drug and gun violations.

turf to the "fundle," a fund to be used for various gang purposes including bail. So Flores says:

> We got a business goin' on Park Street, that's our fuckin street and uh . . . and if a brother comes over to our place and get's [sic] a bundle from us and sells it ["si un hermanito viene donde nosotros y nos coje un bundle y lo entrega"], I want 50 bucks out of it. I don't want no fuckin' 45 or 49 or give you 3 bundles and that's it, you call 3 days and come with the excuse that you don't have my money because, fuck! If I'm paying for you, you gonna give me my money regardless, I don't give a fuck! I'm just sayin', you know what I'm sayin.

And the gang carefully protected the "turf" for the gang's drug dealing. It is not simply that they "knew" who hung out in the neighborhood. Through their regular meetings (four of which were videotaped in a span of two months), they monitored who came and went. Their goal was to determine who would be allowed to deal drugs in that zone, enforcing their rules with threats and violence.

To be sure, as in *United States v. Lacy*, *supra* at n. 9, individual defendants had their individual drug distribution businesses, and even competed for street cus-tomers. At the same time, the defendants here made affirmative use of the gang's organizational structures to advance their goals. It is not only that they benefitted from the gang's general protection. They used the "fundle" as a bail fund when a member was arrested. The regular meetings provided the vehicle to address joint concerns explicitly, and to share information. Drug distribution was the gang's business and essentially, its currency. At one point during a meeting, for example, Edgardo Colon was heard "fronting" drugs to a member in order to facilitate the purchase of gun, which he believed all members should have. Moreover, as I describe below, they were intimately aware of what other defendants were doing, often shared pagers, stepped in when the supply of others was low, and sometimes traded drugs with one another. *See United States v. North*, 900 F.2d 131, 134 (8th Cir.1990); *Edwards*, 945 F.2d at 1398–99.[13] This was not a case, as Schulhofer noted, in which there was a "single broad agreement" alongside numerous distinct agreements in which the participants were aware of the larger agreement, but there was no "mutual dependence or common stake." Schulhofer, *Excessive Uniformity*, *supra*, at 170. Here, there was

---

**13.** Several illustrations appended to § 1B1.3 are apposite:

> Defendant P is a street-level drug dealer who knows of other street-level drug dealers in the same geographic area who sell the same type of drug as he sells. Defendant P and the other dealers share a common source of supply, but otherwise operate independently. Defendant P is not accountable for the quantities of drugs sold by the other street-level drug dealers because he is not engaged in a jointly undertaken criminal activity with them. In contrast, Defendant Q, another street level dealer, pools his resources and profits with four other street-level dealers. Defendant Q is engaged in jointly undertak-en criminal activity and therefore, he is accountable under subsection (a)(1)(B) for the quantities of drugs sold by the four other dealers during the course of his joint undertaking with them because those sales were in furtherance of the jointly undertaken criminal activity and reasonably foreseeable in connection with that criminal activity.

> *Id.* Illus. (c)(6).

> While the instant case does not exactly involve the situation of defendant Q, it is analogous. Enough pooling of resources and explicit coordination took place amongst the defendants to place them in the position of defendant Q.

mutual dependence, explicit coordination, and even the pooling of resources.

As described below, the figure of one kilogram derives from the sales of the defendants themselves or those in league with them, quite apart from the activities of the gang members. If they indeed required gang members to pay a "fundle" for each of their sales, they could be held responsible for all gang sales. As such, the one kilogram figure is conservative.

### 3. Applying the "Jointly Undertook" Standard to the Record of the Defendants' Individual Sales

Even discounting the gang membership, I concluded that the defendants were responsible for 1–3 kilograms of heroin distribution, by tracing what they distributed and with whom, and what they said about the enterprise.[14]

The calculations can be summarized as follows:

| | | |
|---|---|---|
| (a) | Direct sales by all defendants | – 108 grams |
| (b) | Evidence of other sales deduced from statements made during the investigation | – 54 grams |
| (c) | Historical sales by Pagan | – 542–828 grams |
| (d) | Historical sales by Cruz | – 427–499 grams |
| (e) | Historical sales by Paul Rios | – 165–248 grams |
| (f) | Historical sales by Gomez | – 13–27 grams |
| | TOTAL | – 1,309–1,764 grams |

**14.** In addition, the government provided the Court with FBI reports (dubbed "302s") that recounted conversations with cooperating witnesses, and FBI surveillance. I reviewed these reports, but only relied on them to the extent that they were corroborated by the audiotapes and video recordings.

**15.** In both cases, the government prepared a written statement of facts which was explicitly adopted by the defendants at their Rule 11 colloquy. Rule 11 of the Federal Rules of Criminal Procedure provides in pertinent part: "Before accepting a plea of guilty ..., the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant under-

### a. Colon Brothers, Santiago, Cruz and Pagan: Statements of Pagan and Cruz

The statements made by Pagan and Cruz during their plea colloquies concerning their own roles in the drug distribution activities at issue here are telling.[15] While both men entered into plea agreements, neither agreed to cooperate with the government in the sense of providing information against other codefendants, testifying, or other activities. Rather, they simply adopted the government's account of the nature of their own participation—what they distributed, with whom they worked, and for how long.

Defendants would have me give these statements no weight. They were the product of a negotiation, they suggest, not truth. To be sure, none of the defendants before me is bound by the statements of Pagan and Cruz as a matter of law. The statements of Pagan and Cruz are their own admissions, which, were this a trial, would arguably only be admissible against them.[16]

But this is a sentencing proceeding. The statements of Pagan and Cruz were sworn statements, given at a Rule 11 hearing while each was represented by counsel. Plainly, they should be given weight here. Indeed, any other approach would lead to

stands ... the nature of the charge to which the plea is offered." Fed.R.Crim.P. 11(c). The defendant's understanding of the charges is a "core concern" of Rule 11. *United States v. Allard*, 926 F.2d 1237, 1244–45 (1st Cir. 1991).

**16.** The cases cited by the defendants are not apposite. *See United States v. Blevins*, 960 F.2d 1252, 1260 (4th Cir.1992); *United States v. Lopez–Caceres*, 89 F.Supp.2d 168, 172 (D.P.R.1999). The issue in these cases was whether the statements were admissible *at trial* to establish guilt, an issue which the court resolved in favor of the defendant because of the possibility of prejudice.

profound inconsistencies as between the defendants who made these admissions during their plea colloquies and others who did not, but who may have worked alongside them in the drug distribution business. *See supra* note 4. Nevertheless, I sought to test the admissions in the Pagan and Cruz statements against the evidence that was presented through the audio and videotapes and I concluded that these statements were entirely credible.

Cruz and Pagan both agreed that they worked with Edgardo Colon, using his pager to fill customer requests, and with Wilfredo Colon, as the source of supply. The Cruz–Pagan–Colon brothers group was dealing at least 100 bundles a day in January of 2002.[17] The Pagan–Colon brothers group had been dealing at the same pace, at least since the early fall of 1999. If Pagan is responsible for at least 1 kilogram for that four-and-a-half-month period, plainly so are Edgardo and Wilberto Colon.

In the tapes, Pagan identified himself as one of Edgardo Colon's workers, "available all day and all night".[18] Cruz confirmed to the CW on tape that he was working with Pagan for Edgardo Colon. The cooperating witness identified Edgardo Colon and Pagan as part of the same transaction. Other CWs described Cruz as regularly using Edgardo Colon's pager, assisting

Edgardo Colon in packaging the heroin and using the money to repay Wilberto Colon. Indeed, the Colons had other workers as part of their network as well, notably Paul Rios[19] and Hector Gomez.[20]

The transcripts of conversations with Edgardo Colon—his own words—amply confirm his responsibility for dealing at the level of 1 kilogram, at the least. In the very first sale recorded in this investigation, on July 1, 1999, Edgardo indicated that he was willing to establish a business relationship with the cooperating witness and give him Wilberto's beeper because his own was disconnected. On other occasions, he tried to collect money from a CW for the CW's purchase of drugs from his brother, Wilberto Colon.

And Wilberto was Edgardo's principal source of supply—and indeed, the principal source of supply for all defendants. Wilberto was ready to sell heroin at a moment's notice to the highest bidder. Quite apart from the admissions of Cruz and Pagan, and the overheard conversations of Wilberto, it is clear that Wilberto was capable of making sales of larger and larger amounts of heroin to a CW during the fall of 1999. He repeatedly indicated his willingness to sell more and get the CW whatever he wanted, 100 grams or any other amount. Also, despite the fact that Wilberto was unemployed and had no verifiable employment, he advised the CW that he had just purchased a car.[21]

---

17. Pagan admitted distributing 30 bundles a day, or 828 grams. Even if the amount were "only" 20 bundles, the total would be 542 grams. In any event, Pagan has admitted to 1,000 grams by himself. Cruz specifically acknowledged the distribution of at least 70 bundles per day or 499 grams, although he admitted to 750 grams (when considering amounts distributed by others with whom he was in league).

18. While statements made by the defendants in connection with monitored drug transactions surely could be puffing, *see United States v. Astronomo*, 183 F.Supp.2d 158, 171 (D.Mass.2001), in this case I find otherwise.

These statements have been more than adequately corroborated by all of the other evidence in the case.

19. Rios was described by a CW as an individual who sold 5–6 bundles a day for Edgardo Colon between January of 1999 and the summer of 1999, or 165–248 grams.

20. Gomez stated he sold 2–4 bundles for Edgardo Colon beginning in early summer of 1999 (13–27 grams).

21. Nor did Edgardo have any verifiable income.

Santiago worked with the Colon–Cruz–Pagan group and, to a degree, with Flores and Laboy as well. Unlike the other defendants (Flores, Laboy, and the Colon brothers), Santiago pled guilty to participating in the conspiracy to distribute drugs, admitting to the distribution of 1 kilogram as part of the conspiracy.

And again, apart from the significance of his guilty plea and the admissions that were part of it, the record amply supports holding Santiago responsible for 1 –3 kilograms of heroin. As with Pagan and Cruz, Santiago responded to one CW's inquiry by inviting her to call the pager numbers that his *codefendants* had given her and assured her, "we'll take care of you." Items seized at Santiago's arrest included 2 empty "fingers" of heroin, each of which was capable of holding the eight grams. The taped conversations linked him with Edgardo and Wilberto, at one point responding to a page intended for Wilberto. On another occasion, he acknowledged that his heroin was the same as Edgardo's.[22] And, like Wilberto and Edgardo Colon, Santiago had no visible means of support—apart from dealing heroin.

### b. *Flores/Laboy*

Flores was the acknowledged leader of the LGD organization. Imprisoned until January 1999, Flores resumed both his drug dealing and his drug taking activities upon his release. There is no question that during part of the period of this conspiracy, Flores was hobbled by his addiction. Since LGD leaders were not supposed to take drugs, his leadership was under attack. The record makes it quite clear that it was Victor Laboy who stepped into the breach. If Flores is responsible for a kilogram—through his leadership of the gang, or his own activities—so is Laboy.

The first heroin sale in the investigation was made on June 29, 1999, from Flores at his residence on Park Street. Within minutes after the CW arrived, Flores not only sold him heroin (.22 grams), but also tried to recruit him to sell heroin on Flores' behalf. He then reported to the CW that he (Flores) sold "rock" 24 hours a day, and that all he had to do to make money selling drugs was to stay home and wait for the business to come to him.

Flores acknowledged that he has worked for only six weeks since leaving school in 1986. And later, at the LGD meeting, Flores told the gang: "My life ... All I do is sell my drugs" and reminded them of LGD's business on Park Street and their obligation to pay him $50 for their transactions.

Laboy reported to the CW in July of 1999 that he and Flores were partners in the ongoing drug business.[23] Indeed, when Flores was in Providence, Laboy agreed to make a multi-gram purchase with the CW, splitting the cost with the CW, again seeking to expand the distribution network with other "partners."

Laboy backed up other gang members when their customers could not find them. When Laboy and the CW were unable to locate Wilfredo Colon, in order to make a more substantial purchase of heroin for resale, Laboy offered some of his own to the CW to provide for the CW's customer. And, as with the others, Laboy's comments suggested that he was able to get more and more heroin. On June 23, 1999, after the sale of 6 bundles to the CW, the CW asked if he could buy gram quantities of heroin; Laboy responded: "You let me

---

**22.** Also linked to Laboy and Flores, Flores told the CW that he was working with Santiago, Laboy and the Colons.

**23.** Laboy agreed that he sold .58 grams (July 6), .55 grams (July 9), and 1.30 grams (July 23).

know, I'll get it for you." Laboy again suggested that he and the CW go "half and half." Laboy even offered to "front" the CW nine additional bundles "so [he] can make a couple of bucks." Laboy referred to his regular customers—one, for example, who "comes every two days ... for six or seven." Laboy went to Wilberto Colon when he heard that the CW wanted to make an even larger purchase of 10 grams.

Finally, in a conversation that suggests Laboy's acute awareness of what was transpiring throughout the gang's territory, at one point Laboy and the CW decided to abandon their efforts to buy from Wilberto Colon that day because Wilberto Colon had just made a sale of 20 more grams.[24] Laboy concluded that there was not likely to be a ready market for more sales.

Other defendants referred to their ties to Laboy in their taped conversations with the CWs. Wilberto Colon told the CW that he had been selling to Laboy. Flores linked himself and Laboy directly with the Colon network and Santiago. Another CW, Hector Gomez, reported that he (Gomez) not only regularly sold 2–5 bundles for Edgardo Colon, but he also sold additional amounts for Flores and Laboy. Guzman, another CW, testified that he too sold for Edgardo, Laboy and Flores, totaling several bundles per day. Even if there were multiple drug distribution networks, they were interconnected sharing sources of supply, workers, pagers, equipment, customers, even "fronting" drugs when someone ran out.[25]

And, like the others, Laboy acknowledged that he had no source of legitimate money and never had. At his presentence interview, he conceded that he "supported himself ... through the proceeds of illegal activity."

To be sure, Laboy claims that by May 20, 1999, he was trying to distance himself from the gang's Lawrence activities, even moving out of state to live with his girlfriend. But he was obviously unsuccessful. He attended the gang's meeting in September and then again in October. He obviously remained a "Captain," and participated in the gang's activities. As of October, Wilberto Colon indicated that he was still selling to Laboy. (Flores identified his captains, including Laboy, and admonished everyone that "if anything happens" they were to bring the information to him or one of his captains.)

Laboy was one of the keepers of the gang's "book." He was scolded by Flores for "losing the book," Flores noted the importance of the gang's keeping their papers together. While the significance of "the book" is not altogether clear to me, it surely suggests that Laboy would be acutely aware of gang activities and charged with promoting them, activities that included heroin distribution.

Laboy, like Flores, then, is accountable for a kilogram of heroin. His accountability stems not only from his gang connections and the fact that he is part of the leadership group that formulated and executed gang policies to protect certain geographic areas from competition from other heroin traffickers, but the fact that he, like the other defendants, took advantage of those policies by distributing heroin within the gang's areas. He is also accountable for a kilogram of heroin because of his partnership with Flores, his link to Wilberto Colon, and the Edgardo–Santiago group.

---

24. The government suggests that Laboy knew about this because *he* was the purchaser.

25. The evidence also suggested that the heroin of Laboy and Flores was packaged in a fashion similar to that of the Colons and Santiago.

Accordingly, I conclude that the defendants Flores, Laboy, Santiago, Pagan, and the Colon brothers are responsible for the distribution of at least one kilogram of heroin, which, under U.S.S.G. § 2D1.1, has a base offense level of 32.

## IV. ROLE ADJUSTMENTS

■ Amendment 345 to U.S.S.G. § 3B1 notes that the "determination of a defendant's role in the offense" is made on the basis of all relevant conduct rather than merely offense of conviction. *United States v. Ruiz–Batista,* 956 F.2d 351 (1st Cir.1992). After reviewing all of the tapes, audio and video, and the other exhibits offered by the government, I conclude that the defendants Flores, Laboy, Santiago, and Edgardo Colon are also entitled to an adjustment of four points under § 3B1 for their supervisory roles in the drug distribution business. Each was an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." § 3B1.1(a). The "five or more participants" standard is met by reviewing the attendees at the gang meetings, who plainly facilitated the distribution of drugs at the direction of the President and Captains at LGD. The "otherwise extensive" standard is met by the complexity of the organizational structure of the LGD, its reach into the community etc.[26]

## V. INDIVIDUAL DEFENDANTS

### A. Laboy

Base Offense: 32
Adjustment for Role in the Offense: 4
Acceptance of Responsibility: –3
Total Offense Level 33
Criminal History III

---

**26.** Significantly, the application notes of § 3B1.1 indicate that this adjustment may also be appropriate "in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who never-

168–210.

I sentenced Laboy to 168 months. I declined to depart upward under U.S.S.G. § 4A1.3, as the government moved, on the grounds that Laboy's criminal history did not reflect the serious of his criminal conduct. The government sought an upward departure to Criminal History Category VI.

### B. Santiago

Base Offense: 32

Role Adjustment: + 4

Acceptance of Responsibility: –3

Criminal History I

135–168

■ I sentenced Santiago to 135 months. I declined to depart upward, as the government moved, also under U.S.S.G. § 4A1.3. The government would have me "count" a conviction which had been vacated in the state court (a 1997 conviction for resisting arrest). I declined to do so. If I were to count it, as the government suggested, Santiago would be considered a career offender, with a substantial increase in punishment. The underlying facts of that conviction, however, have never been litigated. While the charge sounds serious, the defendant received one year of probation for it. I refused to hinge a finding of such importance on a record as ambiguous as this.

### C. Edgardo Colon

Base Offense: 32

Role Adjustment: + 4

---

theless exercised management responsibility over the property, assets, or activities of a criminal organization." That definition applies to Flores and his "captains."

Acceptance of Responsibility: –3

Criminal History IV

188–235

■ I declined to apply a specific offense characteristic adjustment under U.S.S.G. § 2D1.1(b)(1), as the government moved, because of Edgardo Colon's possession and use of a firearm in connection with the heroin trafficking, and sentenced him to 188 months. While Colon talked about firearms on the tapes, the government could cite to no specific instance in which Colon had actually brandished a firearm. I also declined to depart downward under U.S.S.G. § 4A1.3.

### D.   *Wilberto Colon* [27]

Base Offense: 32

Acceptance of Responsibility: –3

Criminal History II

97–121

The defendant moved for a downward departure on a number of grounds including that his criminal history over represented his culpability under § 4A1.3. I agreed and found that the defendant's criminal history was more reflective of a defendant in Criminal History Category I. Therefore, I sentenced the defendant to 87 months.

### E.   *Flores*

Base Offense: 31

Role in the Offense:  + 4

Acceptance of Responsibility –3

Criminal History VI

Flores' status as a career offender resulted in a guideline range of 188–235.

While defendant moved for a downward departure under § 4A1.3, I declined to do so. I sentenced Flores to 188 months.

I did not adjust Flores' status for his role in the offense in deference to the fact that he has been ill for part of the period covered by the indictment. It made no difference ultimately to the outcome of Flores' case because of his status as a career offender.

### F.   *Pagan*

Base Offense: 32

Acceptance of Responsibility:  –3

Offense Level:  29

Criminal History of III.

Pagan was also a career offender, subject to a guideline range of 151 to 188 months. However, a review of Pagan's record suggested that a downward departure was appropriate on § 4A1.3 grounds. I found that a criminal history category III (from the level VI required by a career offender status) was more appropriate, and thus with an offense level 29, the guideline range was 108–135. I then sentenced Pagan to 108 months.

**SO ORDERED.**

---

**27.**  Wilberto Colon was not a member of LGD.