**UNITED STATES of America,**

v.

**Darryl GREEN, Jonathan Hart, Edward Washington, Branden Morris, and Torrance Green, Defendants.**

**No. CRIM.02–10301–NG.**

United States District Court,
D. Massachusetts.

July 7, 2004.

William C. Brennan, Jr., Brennan, Trainor, Billman & Bennett, LLP, Marlboro, MD, for Darryl Green (1), Defendant.

Christie M. Charles, George F. Gormley, P.C., Boston, MA, for Jonathan Hart (2), Defendant.

John H. Cunha, Jr., Cunha & Holcomb, PC, Boston, MA, for Edward Washington (3), Defendant.

Patricia Garin, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Branden Morris (4), Defendant.

Randolph M. Gioia, Law Office Of Randolph Gioia, Boston, MA, for Darryl Green (1), Defendant.

George F. Gormley, Boston, MA, for Jonathan Hart (2), Defendant.

Theodore B. Heinrich, United States Attorney's Office, Boston, MA, for USA Plaintiff.

David P. Hoose, Katz, Sasson, Hoose & Turnbull, Springfield, MA, for Branden Morris (4), Defendant.

Sarah Jennings Hunt, Sarah Jennings Hunt, Attorney at Law, Cambridge, MA, for Darryl Green (1), Defendant.

David J. Huss, Rapid City, SD, for Branden Morris (4), Defendant.

Wayne R Murphy, Murphy & Flaherty, Boston, MA, for Torrance Green (5), Defendant.

Melvin Norris, Mel Norris, Wayland, MA, for Branden Morris (4), Defendant.

Jeffrey B. O'Toole, Washington, DC, for Darryl Green (1), Defendant.

Max D. Stern, Stern, Shapiro, Weissberg & Garin, Boston, MA, for Branden Morris (4), Defendant.

## MEMORANDUM AND ORDER RE: SEVERANCE/BIFURCATION OF GUILT AND PUNISHMENT

GERTNER, District Judge.

### TABLE OF CONTENTS

I. *INTRODUCTION* ...................................................314

II. *BACKGROUND* ....................................................316
    A. *Prior Indictments* ............................................317
    B. *Severance Motions* ...........................................318
        1. *The Government's Position* ...............................318
        2. *Branden Morris' Position* ................................318
        3. *Darryl Green's Position* .................................318
        4. *Hart and Washington's Position* .........................318

III. *LEGAL ANALYSIS* ...............................................318
    A. *Standards* ...................................................318
    B. *The Significance of Modlin* ..................................320
    C. *Severance of Darryl Green and Morris from Each Other* ...................323
        1. *Bruton Issue* ...........................................323

    2. *Antagonistic Defenses* ........................................... 324
    3. *Joint Penalty Phase* ............................................. 325
    4. *Conclusion* .................................................... 326
  D. *Severance Of The Non–Capital Defendants From The Capital*
     *Defendants* ................................................... 326

IV. *DEATH–QUALIFIED JURY* ......................................... 328

V. *CONCLUSION* .................................................... 333

## I. INTRODUCTION

Virtually all of the parties in the instant case—including the government—have argued that severance is appropriate as to either specific defendants or specific counts. The grounds vary: There are the claims one might find in any case with multiple defendants, for example, that severance is required by *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because of admissions by one or more defendants, or that it is warranted under Fed. R.Crim. Pro. 14 because of mutually antagonistic defenses. But there are also claims unique to the facts of this case and to the severe penalty the government seeks: This is a racketeering case and one of the racketeering acts alleged is a murder, which carries a potential death penalty as to two of the defendants.

The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, which dates to 1970 was enacted in order to fight organized crime, and specifically, to dilute its power by crippling its financial base. *See* Organized Crime Control Act of 1970, Pub.L. No. 91–452, 84 Stat. 922–923 (Statement of Findings and Purpose). Within the past decade, however, RICO has been used to prosecute urban street gangs, whose financial base was allegedly the distribution of drugs. The choice of charge is significant: A RICO prosecution enables the government to introduce the "bad acts" of codefendants, which would arguably not be admissible otherwise, and in this case also provides the basis for the government to seek the federal death penalty.

The government alleges that the five defendants were members of the "Esmond Street Posse" (hereinafter "Esmond Street") racketeering enterprise, an enterprise whose goal was to engage in the sale of crack cocaine and marijuana, to seek to prevent others from interfering with their sales, and specifically, to carry on a violent dispute with a rival gang, the Franklin Hill Giants. That dispute allegedly led to a number of murders and attempted murders during a one year period in 2000 and 2001.

The defendants claim that there is no basis for a RICO indictment, and that the government has inappropriately strung together a series of acts committed at different times, by different persons, for different motives, all to the detriment of the defendants. Moreover, they argue that the government has no reasonable expectation that the several acts alleged in the indictment comprise acts in furtherance of an Esmond Street racketeering enterprise, because of Judge Wolf's findings in *United States v. Modlin*, 01–cr–10314–MLW. In *Modlin*, a drug distribution indictment in which three of the defendants here were named (along with others), the Court at sentencing rejected the allegation that anything like an Esmond Street conspiracy existed. Esmond Street, the Court concluded, involved nothing more than a group of people who hung out together in

the same geographical area, and dealt drugs independently of one another.[1]

RICO also provides the basis for the government to seek the federal death penalty, which complicates the case still further: Count Sixteen alleges that Branden Morris ("Morris") and Darryl Green[2] killed Terrell Gethers ("Gethers") "for the purpose of maintaining and increasing position in the Enterprise, which was an Enterprise engaged in racketeering activity." The defendants will first be tried before a jury to determine their guilt or innocence, and if convicted, tried in a separate proceeding to determine the punishment. The punishment jury will have to be "death-qualified"—that is questioned at voir dire regarding attitudes toward the death penalty. The government is permitted in a capital case to strike for cause any potential juror whose views about the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); *Witherspoon v. Illinois,* 391 U.S. 510, 520, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

Defendants Branden Morris and Darryl Green claim that they cannot be tried together in either the guilt or the punishment phase because, among other things, each claims the other is responsible for the shooting. The non-death penalty defendants, Jonathan Hart ("Hart") and Edward Washington ("Washington") seek severance from the death penalty defendants for a number of reasons, including that they will be prejudiced if their jury is death-qualified, and that joinder with the death-qualified defendants will needlessly slow the trial of their cases.

If I were to adopt the government's position, I would try at least four of the defendants together (all but Torrance Green, whose statements all parties agree raise *Bruton* problems) and then, if the capital defendants are convicted, hold individual penalty phase proceedings for Darryl Green and Morris before the same jury that decided guilt. If I were to adopt certain defendants' positions, I would sever nearly everyone and conduct as many as seven separate trials.[3]

I adopt neither side. I have serious doubts as to whether a joint trial of the sort the government envisions will in fact promote judicial economy let alone be remotely fair or constitutional. At the same time, the defendants' proposal is needlessly complicated, and, as I describe below, may well be unfair to some of the defendants. As per my June 2, 2004, order,[4]

1. Judge Wolf made this finding on May 20, 2003, at the sentencing hearing of three defendants, Modlin, Britt, and King. Although these defendants had pled guilty to Count One alleging conspiracy to distribute cocaine base (under 21 U.S.C. § 846), at sentencing Judge Wolf determined that the overall drug quantity sold by each defendant would not be attributed to the other defendants because of the government's failure to prove that a conspiracy existed. *See Derman v. United States,* 298 F.3d 34 (1st Cir.2002). Instead, Judge Wolf attributed the drug weight to each defendant based on direct sales or the sales of which the defendant aided or abetted.

2. I will use the full names of Darryl Green and his codefendant Torrance Green in this memorandum, to distinguish them.

3. In order to more clearly express questions of efficiency, I will refer to the punishment proceeding of a death penalty defendant's trial as a separate "trial." I do so solely for the purpose of making calculations and comparisons.

4. I issued a procedural order on June 2, 2004, severing the trials, and setting deadlines. I amended the order on June 28, 2004, to the extent that I opened one issue for reconsideration—death-qualification of the guilt jury as

Darryl Green and Jonathan Hart will be tried on January 10, 2005. My inclination at this point is that Branden Morris and Edward Washington be tried together on April 11, 2005, but as is discussed below, I will revisit their joinder following the completion of the Darryl Green/Hart trial. Torrance Green will be tried on July 11, 2005.

## II. BACKGROUND

On September 17, 2003, a superceding indictment was returned against Hart, Darryl Green and Morris, along with Edward Washington and Torrance Green (hereinafter "Pending Indictment"). The government filed a Notice of Intent to Seek the Death Penalty pursuant to 18 U.S.C. § 3591–2 as to Darryl Green and Morris. Counts One through Three of the indictment in the above case charge defendants Darryl Green, Morris, Hart, Washington and Torrance Green with racketeer-

ing (18 U.S.C. § 1962(c)), racketeering conspiracy (18 U.S.C. § 1962(d)), conspiracy to murder, and murder in aid of racketeering (18 U.S.C. § 1959(a)(5)) during the period between June 2000 and September 2001. The manner and means of the enterprise included selling crack cocaine and marijuana in and around Esmond Street, Dorchester, notifying one another about a dispute with another gang, the "Franklin Hill Giants," and stashing and using firearms. Counts Four through Seventeen charge specific individuals with various assaults and firearms offenses.[5] As described above, the glue connecting these counts and these defendants is their common membership, so the government alleges, in the Esmond Street racketeering enterprise.

On the face of the indictment, some patterns can be discerned.[6] Certain defendants are named in the overall racketeering enterprise at certain times. Mor-

well as the punishment jury. I continue to defer that issue for further briefing, along with the joinder of Morris/Washington in a single trial and the severance of the counts. In other respects, this memorandum provides the factual and legal basis for the preceding severance orders.

5. In Counts Four, Five, and Six, Torrance Green is charged with assault in aid of racketeering (18 U.S.C. § 1959(a)(3)), use of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)), and possession of a firearm in furtherance of a crime of violence (18 U.S.C. § 924(c)).

In Counts Seven through Ten, Edward Washington is charged with assault in aid of racketeering (18 U.S.C. § 1959(a)(3)), use of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)), and two counts (Nine and Ten) of possession of a firearm in furtherance of a crime of violence (18 U.S.C. § 924(c)).

Count Eleven charges Branden Morris with possession of a firearm in furtherance of a crime of violence (18 U.S.C. § 924(c)).

Counts Twelve and Thirteen charge Jonathan Hart with assault in aid of racketeering

(18 U.S.C. § 1959(a)(3)) and use of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)).

Counts Fourteen and Fifteen charge Jonathan Hart and Darryl Green with assault in aid of racketeering (18 U.S.C. § 1959(a)(3)) and use of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)).

Counts Sixteen and Seventeen charge Darryl Green and Branden Morris with murder in aid of racketeering (18 U.S.C. § 1959(a)(1)) and use of a firearm in relation to a crime of violence (18 U.S.C. § 924(c)).

6. Morris' counsel, by way of affidavit, suggests that three periods of violence can be discerned from the discovery so far—the first spurt of violence, from September 8 to 16, 2001, caused by "a lack of respect" (when one individual bumped into another and refused to apologize), the second in April of 2001, with no known motive, and the third on August 24, and 25, 2001, over a young woman. Affidavit of Patricia Garin, attached to Morris' Supplemental Memorandum in Support of Motion to Sever Count Eleven [docket # 165] filed June 18, 2004.

ris and Hart are named in counts towards the end of the period, from March 13, 2001 [7] (for Morris) and March 28, 2001 (for Hart), and extending to August 25, 2001 (Morris), and July 5, 2001 (Hart). Washington was allegedly involved at the beginning of that period, September 16, 2000, but was taken into custody on November 14, 2000; and the allegations against him consequently end there. Darryl Green is alleged to have been involved for a longer period—spanning from September 16, 2000 to August 25, 2001. He allegedly joined with Hart in the counts alleging an attempt to murder Anthony Vaughan (Counts Fourteen and Fifteen), and with Morris in the counts alleging the murder of Terrell Gethers (Counts Sixteen and Seventeen).[8]

### A. Prior Indictments

Darryl Green, Morris, and Hart along with ten others, had been joined in an earlier indictment on August 29, 2001, before Judge Mark Wolf of this Court (*United States v. Modlin*, 01–cr–10314–MLW) (hereinafter "the First Modlin Indictment" or "Wolf case"), which alleged drug distribution. Count One of that indictment charged a conspiracy to distribute cocaine base between September 2000 and December 2001 (roughly comparable to the period in the pending indictment—June 2000 to September 2001). In addition, the First Modlin Indictment charged thirty counts of possession or distribution of the drug by individual defendants.

A First Superceding Indictment was returned on December 5, 2001 (hereinafter "*Modlin* indictment") against the same thirteen defendants (Hart, Darryl Green, Morris, and ten others) and one additional defendant. Everyone in the *Modlin* indictment, except for Hart, Darryl Green and Brandon Morris, pled guilty. The trials of Darryl Green, Morris, and Hart on the *Modlin* charges were continued until after judgment has entered in this case.

The two indictments—the *Modlin* indictment and the Pending Indictment—overlap in a number of respects. While the focus of the *Modlin* indictment was drug distribution, drug distribution is alleged here as among the racketeering acts.[9] The substantive counts of the Pending Indictment focus on violent acts and gun possession allegedly in furtherance of the racketeering enterprise, issues not included in the *Modlin* case.

At the sentencing hearings before Judge Wolf, the government sought to attribute to all of the defendants a substantial quantity of drugs possessed or distributed by others in furtherance of the conspiracy alleged in the indictment. After an evidentiary hearing, in which the government

7. As described above, Morris claims that there will be no proof that a firearm found under his bed in April of 2001 was part of the racketeering enterprise.

8. In the government's Notice of Intent to Seek the Death Penalty, it alleges, as a nonstatutory aggravating factor under 18 U.S.C. § 3593(a) that Darryl Green urged Washington to attempt to murder Richard Green and thereafter helped him to escape apprehension.

9. Various substantive counts in the *Modlin* case correspond to several racketeering acts alleged in the pending indictment. Count Nine, charging that Hart possessed and distributed drugs on March 28, 2001, corresponds to Racketeering Act Four. Count Twenty–One, charging that Morris and two others possessed and distributed cocaine base on June 20, 2001, corresponds to Racketeering Act Six of the pending indictment. Count Twenty–Five, charging that Darryl Green possessed and distributed cocaine base on July 3, 2001, corresponds to Racketeering Act Seven. Count Twenty–Six, charging that Darryl Green possessed and distributed cocaine base on July 18, 2001, corresponds to Racketeering Act Eight.

called four witnesses, Judge Wolf found "no conspiracy has been proven by a preponderance of the evidence." He added: "The evidence ... does not prove a conspiracy. The defendants did not have an agreement .... There was no hierarchy or sharing the profits or things like that. What there was was parallel activity in the same area."

## B. Severance Motions

I will provide an overview of the positions of each of the parties before addressing each position in detail.

### 1. The Government's Position

The government takes the position that all four of the remaining defendants (Morris, Darryl Green, Hart, Washington) should be tried together before a single death-qualified jury, and if Morris and Green are convicted of Count Sixteen, a single penalty phase. To preserve the defendants' rights to an individualized punishment phase, the punishment jury would hear the case against one defendant, followed by the case against the other. All told, the trial will take 3–6 weeks, exclusive of jury selection and the penalty phase. (The government estimates that jury selection—assuming death-qualification—could take as long as two to three weeks in addition.)[10] Only Torrance Green would be tried alone.[11] Thus, according to the government's theory, there should be three trials, at least one lasting months, before two juries.

### 2. Branden Morris' Position

Morris has moved to sever his trial from both the non-capital defendants and his capital codefendant, Darryl Green. In addition, Morris moves to sever Count Eleven, charging him with possession of a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c).

The Morris proposal then would involve the a) trial of Morris, b) trial of Green, c) penalty phase for Morris, if needed, d) penalty phase for Green, if needed, e) trial of Morris on Count Eleven, f) joint trial of Hart and Washington, and g) trial of Torrance Green. Under this proposal, there would be seven trials, before at least five juries.

### 3. Darryl Green's Position

Green seeks parallel relief—that he be tried separately from all others, but in addition, Green claims that Count Sixteen (the capital murder count) be tried separately from all other counts.

### 4. Hart and Washington's Position

Hart and Washington seek severance from Morris and Darryl Green (as well as from Torrance Green, which the government does not contest). According to their proposal, there should be a) a joint trial of Morris/Darryl Green, b) a penalty phase of Morris/Darryl Green if appropriate, c) a trial of Hart and Washington, and, d) a trial of Torrance Green. Their proposal would yield four trials before three juries.

## III. LEGAL ANALYSIS

### A. Standards

■ Under Rule 8(b) Fed. R.Crim. Pro. the government is entitled to join two or more defendants in a single indictment if

---

**10.** With multiple defendants and counsel, I think this is a substantial underestimate.

**11.** The government concedes that Torrance Green should be tried alone because of *Bru-* ton problems if the statements it intends to offer against Torrance Green are deemed admissible.

they are alleged to have participated in "the same act or transactions or in the same series of acts or transactions, constituting an offense or offenses."[12] These acts or transactions may be linked through an allegation of a pattern of racketeering activity, *see, e.g., United States v. Tashjian,* 660 F.2d 829 (1st Cir.1981), but only so long as that allegation is made in good faith and upon a factual basis. *United States v. Luna,* 585 F.2d 1, 4 (1st Cir. 1978); *see also, United States v. Ong,* 541 F.2d 331, 337 (2d Cir.1976). Joinder is improper if the government lacks a "reasonable expectation" of proving the required connection.

Fed. R.Crim. Pro. 14, recognizes that there may be instances in which defendants, although appropriately joined under Rule 8, should nevertheless be severed in the discretion of the trial court.[13] Rule 14 permits severance if "consolidation for trial appears to prejudice a defendant or the government." In that case the court may "order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." ·

On the one hand, joint trials are often more efficient than individual trials, and avoid having victims and witnesses repeat the inconvenience and sometimes the trauma of testifying. Moreover, severed trials could "randomly favor the last-tried defendants who have the advantage of knowing the prosecution's case beforehand." *Richardson v. Marsh,* 481 U.S. 200, 210, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). At the same time, Rule 14 directs the court to ask, in effect—at what price judicial economy?—particularly with respect to individual defendants. There is no question that joint trials, involving defendants with different degrees· of culpability, can raise a substantial risk of prejudice, that evidence of a codefendant's wrongdoing might erroneously lead the jury to convict the defendant, that exculpatory evidence that would be available to a defendant tried alone may well be unavailable· in a joint trial. *See Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).[14]

---

12. Rule 8(b) provides:
   **Joinder of Defendants.** The indictment ... may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.

13. Rule 14(a) provides:
   **Relief.** If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

14. Indeed, social scientists have studied the impact on the jury of hearing about misconduct, even misconduct unrelated to the merits of the case, like a prior conviction, on the jury's ability to weigh evidence fairly against the defendant. They have described a "halo

effect," meaning that once a juror hears about misconduct, he transmutes that bad act into evidence of a bad character, which deflects the jurors from fairly assessing the evidence. *See* Valerie P. Hans & Anthony N. Doob, Section 12 of the Canada Evidence Act and the Deliberations of Simulated Juries, 18 CRIM. L.Q. 235, 251 (1975–1976) (finding that the fact of the defendant's prior criminal record "permeates the entire discussion of the case, and appears to affect the juror's perception and interpretation of the evidence"); Anthony N. Doob & Hershi M. Kirshenbaum, Some Empirical Evidence on the Effect of S. 12 of the Canada Evidence Act Upon an Accused, 15 CRIM. L.Q. 88, 89–90 (1972–1973) (concluding that jurors are likely to consider information about a defendant's prior criminal record in determining guilt of the crime charged); Roselle L. Wissler & Michael J. Saks, ·On the Inefficacy of Limiting Instructions: When Jurors Use Prior Conviction Evidence to Decide on Guilt, 9 L. & Hum. Behav. 37 (1985) (finding that mock jurors were more likely to render a guilty verdict when

■ The determination of when potential prejudice reaches the threshold identified under Rule 14—the threshold requiring judicial intervention—is not an exact science. Predictably, the case law involves the appeal of the trial court's denial of severance. Concerns about judicial economy, most courts' abiding faith in limiting instructions, the government's good faith representations about what the evidence will be, usually trump the defendants' concerns about joint trials. Appellate review of lower court decisions to sever trials takes place under an "abuse of discretion" standard. *See United States v. Jones*, 10 F.3d 901, 908 (1st Cir.1993). There is no way of determining what *actually* affected the guilty verdict. The defendants can only speculate and that speculation is rarely sufficient in the face of the trial court's considerable discretion in granting a motion to sever only when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539, 113 S.Ct. 933.[15]

The instant case stands in an unusual posture for two reasons. First, another judge of this Court has seen some of the government's evidence—albeit in truncated form in a sentencing proceeding and involving a similar but not identical indictment. He has made findings that surely reflect badly on a central pillar of the government's case, that the Esmond Street gang was a gang at all, much less a racketeering enterprise. Second, the standards for severance are necessarily leavened by the fact this is a death penalty case. The threshold for determining what constitutes prejudice and when the jury's ability to render a reliable verdict is compromised is necessarily lower than in the ordinary case. *See United States v. Perez*, 299 F.Supp.2d 38, (D.Conn. January 14, 2004) (granting severance based on evidentiary concerns "given the heightened need for reliability in a death penalty trial"); *People v. Keenan*, 46 Cal.3d 478, 500, 250 Cal.Rptr. 550, 758 P.2d 1081 (1988) (upholding denial of severance but recognizing that "[s]everance motions in capital cases should receive heightened scrutiny for potential prejudice.")

With these standards in mind, I consider the various severance motions.

### B. *The Significance of Modlin*

Using Judge Wolf's findings in *Modlin* and the evidence on which it was based, Morris maintains that it is not at all likely that the government will ever meet the foundational requirement— a reasonable expectation of linking him (or indeed any of the defendants) in a racketeering enterprise, even the under rigorous standards of Rule 8(b). He maintains that the evidence will show that there was no drug

---

told of a defendant's prior convictions). While some of these studies were conducted several years ago and involve Canadian juries, there is no question that the evidentiary limitations on the admissibility of prior convictions and bad acts, reflect similar concerns.

15. Given the stringent standard, the Supreme Court has recognized the difficulty of proving prejudice after severance has been denied: Notwithstanding such assertions, the courts have reversed relatively few convictions for failure to grant a severance on grounds of mutually antagonistic or irreconcilable defenses. *See, e.g., United States v. Tootick*, 952 F.2d 1078 (9th Cir.1991); *United States v. Rucker*, 915 F.2d 1511, 1512–1513 (11th Cir.1990); *United States v. Romanello*, 726 F.2d 173 (5th Cir.1984). **The low rate of reversal may reflect the inability of defendants to prove a risk of prejudice in most cases involving conflicting defenses.** *Zafiro*, 506 U.S. at 538, 113 S.Ct. 933 (emphasis added).

enterprise,[16] and that even if there were an enterprise organized around drug distribution, the group did not function as a continuing unit during the period of the indictment.[17]

Morris distinguishes the instant case from *United States v. Flores*, 230 F.Supp.2d 138 (D.Mass.2002), and analogizes it to *United States v. Lacy*, 99 F.Supp.2d 108 (D.Mass.2000). In *Flores*, this Court found a gang to be "cohesive and hierarchical ... there were rules, assigned roles, a formal meeting structure, an initiation ritual, joint sources of supply, and the requirement that all who deal on the 'turf' pay into a 'fundle,' a form of tribute." 230 F.Supp.2d at 143 & n. 10. In *Lacy*, however, this Court noted that the "Castlegate Gang" lacked significant structure—it had "no formal hierarchy or chain of command ... the leadership was chosen very informally ... [they did] not wear specific colors or symbols ... there were no rules, no assigned roles or responsibilities." 99 F.Supp.2d at 113–14.

Moreover, Morris contends that even if there were an enterprise, there is no evidence that he had any part of it prior to August 25, 2001, the date of the Terrell Gethers' murder. In fact, if the government were to show that an enterprise suddenly came into being on that date, and murder were a part of it, there is no basis to link that offense as part of the "same series of acts or transactions constituting an offense or offenses," and thus properly joined with the other counts. Finally, Morris challenges inclusion of Count Elev-

---

**16.** Judge Wolf found that there was no conspiratorial organization for the dealing of drugs. There was only "parallel activity." Indeed, in the Grand Jury, DEA task force agent Joao Monteiro adopted the prosecutor's description of the drug sales in the Esmond Street area as follows:

1. The sales involved "relatively small street level quantities."
2. The sellers "don't all share the same source."
3. It "is not a drug organization that's a hierarchical drug organization with one boss who's got the source of the drug supply and other people working for him." The sellers have "their own product" or "they're responsible for their own product."
4. The sellers "make their own money." Even those who share a common supplier, are "competing to make the sale" to make their own commission.
5. "It's less of a hierarchical organization than it is kind of like a shopping mall where there's each independent operator but they've got their place of business." They "protect their turf." "They look out for one another."

Grand Jury Testimony of Joao Monteiro, August 29, 2001, pp. 4, 35, 42–44.

One grand juror was so confused by evidence that the so-called gang sellers acted independently that he asked:

I'm having a hard time understanding if these people are in fact cooperating, are part of a cooperating group in terms of sales of drugs, why are the transactions in the same place at the same time with two different individuals? Can you explain that ... As an example, on 6/27 we have one—one transaction taking place between yourself and Williams, and then what appears to be an independent transaction taking place between Rabb and Brown, having both arrived at the same time. I'm just curious, why, if you went there together and these people are working together, are these things taking place sort of independent? Why wouldn't you buy everything from one person?

*Id.* at 41. Agent Montiero replied that the agents purchased from both individuals because they were "not going to let the crack go back out on the street" and to maintain their "good relationship" with the sellers. *Id.*

In addition, cooperating witness Sean Williams, an alleged Esmond Street member, testified before the Grand Jury, for example, that he sometimes bought his crack from Richard Green, an alleged Franklin Hill Giant. Grand Jury Testimony of Sean Williams, June 16, 2002, p. 8.

**17.** *See* FN 6, *supra*.

en with the others. Count Eleven charges possession of a firearm found under Morris' bed in April of 2001, a firearm Morris notes, that was never linked to any of the assaults or the murder charged in the instant indictment.

The government argues that what Morris is really claiming is not that the government is improperly joining disparate substantive charges with manufactured racketeering and conspiracy charges to bolster the former, but that the government cannot prove its charges at all. The government counters that it can prove that "an enterprise existed, that Morris was associated with it, and that the conduct he is charged with was somehow related to the activities of the enterprise." Issues of proof, it suggests, are for trials, and not severance motions. True enough, except that the government must at the very least show a good faith basis for its RICO accusations since it opens the door wide to prejudicial evidence.

In *United States v. Luna*, 585 F.2d 1 (1st Cir.1978), for example, three defendants were charged with conspiracy to distribute heroin. They were also each charged with a substantive count of distribution of heroin—two defendants were charged with one sale in Count Two, and the remaining defendant was charged with a separate sale, which took place a month later, in Count Three. The defendants claimed that the conspiracy count had not been added in good faith, that it was used only to join otherwise unrelated substantive offenses. The First Circuit rejected the claim, concluding that the conspiracy count will not rectify otherwise improper joinder, where the count has been added in good faith, and a factual basis for it exists, joinder is permissible." According to the court, the separate defendant's admission that he got the heroin from one of the other two defendants sufficed. *Luna*, 585 F.2d at 4.

In *United States v. Ong*, 541 F.2d 331 (2d Cir.1976), the defendant Young was charged with 20 counts of bribery and participating in a conspiracy with the other defendants to bribe agents of the Immigration an Naturalization Service. Young claimed that the evidence showed that no conspiracy existed between him and his codefendants and that he should be severed from them. The court denied the motion, but granted a motion to acquit him of the conspiracy charge after trial. While the First Circuit questioned whether the conspiracy was alleged by the government in good faith, and found that it was "based on a novel and questionable theory of conspiracy," it nevertheless concluded that the government's evidence satisfied this standard. *Ong*, 541 F.2d at 337.

Likewise in *United States v. Turkette*, 656 F.2d 5 (1st Cir.1981), defendant Vargas was charged with four counts of mail fraud based on arson-generated insurance claims and one count of RICO conspiracy. The indictment included thirteen defendants and nine counts—the RICO count allegedly tied the defendants together. At the close of the government's case, the court dismissed the RICO conspiracy count against Vargas. The jury convicted him of a single mail fraud count and he appealed, claiming, among other things, that the government included him in bad faith in the RICO count without a proper evidentiary foundation. The court held that the judgment of acquittal did not demonstrate bad faith; the defendant otherwise failed in his burden to show it. *Turkette*, 656 F.2d at 9.

In the instant case, the government argues that Judge Wolf's findings in *Modlin* are not apposite as to the issue of good faith. They were made in connection with a sentencing hearing, which was necessari-

ly truncated and concerned the attribution of drug weight to each individual defendant under the relevant conduct provisions of the sentencing guidelines. U.S.S.G. § 1b1.3.

The government's argument is curious. First, Judge Wolf did not only find that the drugs distributed by the conspiracy could not be attributed to a given defendant, he found that there was no group, no structure, in effect, no conspiracy tying the defendants at all.[18] Second, he did so applying the minimal evidentiary standard of a sentencing hearing—a fair preponderance of the evidence. If the government cannot meet that minimal standard at sentencing, it is reasonable to wonder how it will be able to satisfy the "beyond a reasonable doubt" standard.

At the same time, the government is correct that Judge Wolf's findings do not bind me in this case, for the reasons suggested above—a truncated proceeding, a different indictment (although with some overlap), different defendants and counsel, a different standard of proof. But while not dispositive in this case, Judge Wolf's findings are surely important. They put this Court in a different position than many judges obliged to address severance issues before the litigation has begun. I have data that I can use to guide severance decisions—that there may be substantial defense arguments about the RICO "glue" linking these defendants, or the acts of which they are charged, that the links as between them may be more fragile than the government maintains.

While I cannot conclude at this juncture that the government's RICO accusations were not brought in good faith based solely on the *Modlin* findings, I will consider those findings in resolving some of the severance issues, as I describe below.

For reasons of judicial economy, fairness, and manageability, I will link certain defendants together who are linked in time in terms of their temporal connection to Esmond Street or by virtue of their specific acts. I will seek to have the government pare down the evidence in the severed trials to focus more directly on the defendants who are being tried.[19] The resulting set of trials, in my judgment, will be both more efficient and more fair.

### C. *Severance of Darryl Green and Morris from Each Other*

#### 1. *Bruton Issue*

Morris claims that certain statements made by codefendant Darryl Green, which name Morris as a participant in the Gethers murder, raise questions under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). *Bruton* requires a) severance of the implicated defendant, 2) joint trial where the prosecution does not use the confession or 3) a joint trial with a redacted confession. Wayne R. LaFave, Criminal Procedure, Vol. 4 § 17.2(b) (2d ed.2004).

The government alleges that both Darryl Green and Branden Morris fired shots at Terrell Gethers. Only one bullet struck him causing the fatal wound. Morris will

---

18. Judge Wolf noted at the hearing: "The defendants did not have an agreement, among other things, and I didn't rely on this exclusively. There was no hierarchy or sharing of profits or things like that. What there was was parallel activity in the same area."

19. In that respect, I would be doing what Judge Zobel attempted to do in *U.S. v. DeCo-*

*logero*, 2003 WL 1538433 (D.Mass. March 21, 2003), vacated in part, 364 F.3d 12 (1st Cir. April 12, 2004) (reversing order postponing trial of certain racketeering acts because judge failed to make findings that she exhausted traditional alternatives to address trial's complexity, like severance of defendants and counts).

say that there was only one shooter and that the shooter was Green. Darryl Green will say that there was only one shooter, and that it was Morris.

Darryl Green, however, allegedly made the following statements, which Morris argues create a *Bruton* problem:

Darryl Green told Homell St. Charles, post-arrest, "[they are] trying to make it seem like I did it—it was the young kid (Branden Morris)." (The co-operating witnesses have alleged that Branden Morris was the "kid" or the "young dude.") According to Homell St. Charles, Darryl Green also may have told him either "the kid was shooting back" or "the kid was strapped." However, it is unnecessary to evaluate these statements under *Bruton* because the government has announced that it does not intend to offer the testimony of Homell St. Charles concerning the post-arrest statements of Darryl Green.

■ The government does intend to introduce statements by Darryl Green to cooperating witness Kenie Smith on August 27, 2001, two days after the Gethers murder and during the alleged, ongoing racketeering conspiracy, as a statement of Darryl Green, supposedly admitting that the murder was in furtherance of the overall conspiracy. Darryl Green allegedly said to Kenie Smith on August 27, 2001, that after Terrell Gethers got out of Richard White's car and put on a Giants shirt "we was dumping revolvers." The "we," the government suggests, refers to Darryl Green and Morris. The admissibility of this statement does not depend on a *Bruton* analysis; it depends upon whether the predicate for co-conspirator hearsay is met.[20] At this juncture, I cannot draw a conclusion one way or the other. If the

statements are admissible in a joint trial, as the government in good faith represents, they would hardly provide the basis for a severance under Rule 8(b).

### 2. *Antagonistic Defenses*

■ Quite apart from technical misjoinder arguments under Rule 8, Morris and Darryl Green also move under Rule 14, alleging prejudicial joinder as between them. In the ordinary course, the court is to grant severance "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). In a death penalty case, as described *supra,* concerns about reliability are heightened, particularly as to severance. *See, e.g., United States v. Bernard,* 299 F.3d 467, 475 (5th Cir.2002), *cert. denied* 539 U.S. 928, 123 S.Ct. 2572, 156 L.Ed.2d 607 (2003); *see also Perez,* 299 F.Supp.2d 38. There is no per se rule; plainly the degree of antagonism must be such that the jury will inappropriately infer that one or both are guilty. *United States v. Talavera,* 668 F.2d 625, 630 (1st Cir.1982).

■ As noted above, the defense maintains that ballistics evidence will suggest that there was only one shooter, not two. Green will say it was Morris; Morris will say it was Green. If the jury agrees that there is only one shooter, the defendants' claims are mutually exclusive, and unlike in *Zafiro,* a zero sum game. *See Zafiro v. U.S.,* 506 U.S. at 543, 113 S.Ct. 933, Stevens, J. concurring. ("I would save for another day evaluation of the prejudice that may raise when the evidence or testimony offered by one defendant is truly

---

**20.** Rule 801(d)(2). Judge Wolf's findings in the *Modlin* case, however, suggest that more of this issue should be pre-tried than usual,

i.e. reviewed in advance of the selection of the jury, and prior to jeopardy attaching.

irreconcilable with the innocence of a code-fendant.") *See also, State v. Kinkade,* 140 Ariz. 91, 680 P.2d 801, 803 (1984) (distinguishing "competing" from mutually antagonistic defenses"). Joinder, Justice Stevens noted, in a case involving mutually antagonistic defenses, may operate to reduce the burden on the prosecutor—by turning a defendant into a second prosecutor. Each side will do everything possible to convict the other defendant, as "defense counsel are not always held to the limitations and standards imposed on the government prosecutor." *United States v. Tootick,* 952 F.2d 1078, 1082 (9th Cir.1991).

The government counters that the evidence will show only a single bullet hit Gethers, but not that there was a single shooter. Moreover, even if there was only a single shooter, the government would argue the defendants were joint venturers or one aided and abetted the other.

The issue is not the position the *government* takes. The issue is whether a jury will be able to hear the opposing position—the defense theory—and reliably consider all positions. There is a considerable risk that each defendant, ably throwing potshots at the other, would make the government's case for it. Specifically, in the din, a juror could well say: "I cannot figure out who did the shooting, given the defendants' mutual accusations, but it doesn't matter. They were involved somehow and that is enough." That conclusion would redound to the government's benefit.

The trials of Darryl Green and Brendan Morris will be severed under Rule 14.

### 3. *Joint Penalty Phase*

■ An additional reason for severing Green and Morris involves the conduct of the penalty phase if Green and Morris are found guilty. The government anticipates a trial in which one defendant will appear before the jury—the same jury which found him guilty—in the punishment phase, followed by the second defendant in front of that same jury. The government contends that it will rely on a single statutory aggravating factor common to both defendants, which would have been litigated to a degree in the guilt phase of the case—that the defendants, in committing the murder of Terrell Gethers, knowingly created a grave risk of death to one or more persons in addition to the victim. The non-statutory factors it would rely on as to Darryl Green are his participation in the shootings of Richard Green and Anthony Vaughan, his lack of remorse, and victim impact statements. For Brandon Morris, the non-statutory factors would be victim impact evidence and his role in the arson murder of Shelby Caddell. The jury would not confuse the two, the government claims, since there are entirely different mitigating factors, and different victims. The government argues that since the defendant in the second punishment proceeding would obviously not have the right to cross examine witnesses in the first proceeding, they will not be able to effectively make mutually antagonistic arguments the way they might during the combined guilt phase.

The government profoundly underestimates the problems. The defense argues, quite forcefully, that in this case an aggravating fact for one defendant is a mitigating fact for another. Darryl Green suggests that he may argue in mitigation that prior to the present offense, he had a stable and loving family with parents, a brother and sisters who describe his otherwise exemplary life. Morris, on the other hand, may argue in mitigation that he has suffered throughout his life from childhood abuse or neglect and has been exposed to horrible violence and a lack of opportunities in his community, which made him vulnerable to the influence of someone old-

er, like Darryl Green. In fact, virtually every argument for mitigation made by one defendant will be in effect an argument against mitigation as to the other defendant if that defendant cannot claim the same attribute.

Proceeding before the same jury would be even more problematic if, as they are likely to do, the defendants argue for mitigation by shifting blame to the other, or by arguing that they are not as worthy of death as their codefendant. Darryl Green points out that Morris may argue that his own (youthful) criminal conduct can be blamed on the (older and more mature) Green. If tried to the same jury, Darryl Green might argue that Morris' conduct was far more heinous than Darryl Green's, and focus on the particularly gruesome arson murder (a non-statutory aggravating factor against only Morris).

Moreover, all of this could well occur in a classic trial by ambush. While the government has to give notice of aggravating factors, a codefendant does not. Indeed, these problems potentially rise above simple fairness and may raise Sixth Amendment confrontation issues and Eighth Amendment concerns about individualized treatment at the punishment phase.

What is more, the defendants have a compelling argument that the order of the punishment trials could be significant. As the second defendant and his counsel sit on the sidelines, the first will present evidence and make arguments that could drastically alter the context in which the second is judged before the same jury. Arguably, the decision-making process of the jury will have evolved without the second defendant's representation in the process. Whichever defendant is tried second would potentially suffer.

### 4. Conclusion

The problems of having the penalty trial of two defendants tried before the same jury add to my concerns regarding the joinder of Darryl Green and Morris during the guilt phase of the trial, and support my conclusion that these defendants must be severed in both phases.

I could follow the severed Morris and Green trials with a joint trial of the non-capital defendants Hart and Washington, followed by a trial of Torrance Green, for a total of six trials (if Morris and Green are found guilty), or defendants Hart and Washington could be joined—either together or as a pair—with either Darryl Green or Morris. I now turn to that question.

### D. Severance Of The Non–Capital Defendants From The Capital Defendants

■ The capital defendants and the non-capital defendants seek a severance between the two groups, for a number of reasons including both judicial management and potential prejudice to all defendants.[21]

---

**21.** The capital defendants argue most powerfully that if they are tried along with non-capital defendants, jurors may infer that because they have been chosen by someone (they may know it was by the government or speculate that it was by the Court) for the death penalty, and others have not, that they are more culpable than the non-capital codefendants.

While this argument is persuasive, I need not address it here because, as described below, my current intention is not to death-qualify jurors at the guilt phase. By structuring the proceedings in that way, any potential concern about Darryl Green or Morris becoming "target" defendants, is alleviated.

The non-capital defendants also make arguments based on the possibility of the guilt jury being death-qualified—that the jury selection process would cause delay, and that acts with which they are charged will take on special significance because they are part of the gov-

The government is correct that, as charged, the death penalty and non-death penalty cases are closely related. It is therefore different than cases such as *United States v. Maisonet,* 1998 WL 355414 (S.D.N.Y.1998), in which the court noted a danger of prejudice where "some of the crimes charged are murder, conspiracy to commit murder, and attempted murder, and where several of the defendants face the death penalty," and others are charged with far less serious offenses. 1998 WL 355415, *5. The judge there severed the trials into one with RICO defendants and another with non-RICO defendants—so that defendants who were charged only with narcotics offenses were not tried with defendants who were charged with crimes of violence.

The levels of culpability are not so clearly distinct here. The only reason that the charges against Hart and Washington are different from those against Darryl Green and Morris is that the shooting victims of Hart and Washington survived. The pending indictment, the government maintains, focuses on the relationship between the RICO enterprise in which all the defendants allegedly participated and the assault and gun charges that flowed from it.

From that perspective, joining Hart and Washington together, and with either Morris or Darryl Green, makes sense. Indeed, the government suggests that I join both with Darryl Green, because the most serious charges against Hart and Washington are assaults in which Darryl Green was, allegedly, a participant.[22] It asserts that

such a trial would involve roughly 50 witnesses, and that no fewer witnesses would be needed to try only Darryl Green and Hart, or only Darryl Green and Washington.

But the number of witnesses is not the only issue. A trial of the three defendants together would involve thirteen counts, and many more racketeering acts.

▮ I have substantial concerns about the ability of the jury to keep the role of each defendant separate and distinct. I believe that there would be a very serious risk of juror confusion that would "prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro,* 506 U.S. at 539, 113 S.Ct. 933. In such a case, "Rule 14 gives the district judge wide authority to sever defendants, counts, or both, upon a showing of prejudice." *United States v. DeCologero,* 364 F.3d 12 (1st Cir.2004). Indeed, as the First Circuit noted in *DeCologero,* 364 F.3d at 24, "[t]here are potentially limits to the complexity that a jury can handle." It is true that the potential trial here is nowhere near the size of *United States v. Andrews,* 754 F.Supp. 1161, 1180 (N.D.Ill.1990), the case discussed by the Court in *DeCologero.* (*Andrews* involved 38 defendants and 175 counts.) But a trial need not be as large as *Andrews* threatened to be to create a fear of prejudice and justify severance, particularly where, as here, that severance has yet to infringe on the government's ability to present all of relevant evidence it desires.[23]

ernment's death penalty case against Darryl Green. (*See* FN. 22, *infra.*) These arguments are similarly moot if the guilt phase jury is not death-qualified.

**22.** Hart is charged along with Darryl Green with assaulting Anthony Vaughan (Counts Fourteen and Fifteen). Washington is charged with assaulting Richard Green (Counts Seven and Eight). A non-statutory

aggravating factor in the government's case against Darryl Green is that Darryl Green allegedly urged Washington to "attempt to assault" Richard Green and aided him in avoiding apprehension.

**23.** I will reserve for now any determinations about how such a severance might limit the government's ability to put forward racketeer-

I will join Darryl Green and Hart because they are formally charged together in the Vaughan counts. Darryl Green's role in Washington's alleged assault of Richard Green is less clear. He is not formally charged as a direct participant to aiding and abetting. The Green assault is alleged as a non-statutory aggravating factor in the vaguest of terms—that Darryl Green urged Washington "to attempt to murder Richard Green" and helped him to avoid apprehension. I cannot tell at this juncture that "urging" would be admissible in a joint Darryl Green/ Washington trial.

For all of the above reasons—case management, juror comprehension, judicial economy, not to mention fairness, severing Washington and leaving Darryl Green and Hart to be tried together is appropriate. Two defendants per trial, assuming Washington and Morris are also paired, will enable the court to better sort out evidentiary issues, to carefully evaluate the racketeering acts alleged, to limit them where appropriate according to the time period involved, and the specific defendants involved.[24]

In my initial procedural order, I ordered that Morris be tried with Washington in April of 2005. I concluded that there was no danger of prejudice from a joint trial because the time of Washington's alleged participation is defined—his role in the conspiracy ended in November 2000, when he was taken into custody. Likewise Morris, who has argued that his role in the enterprise did not begin until March 2001, can easily make that argument in a combined Morris/Washington trial.

However, on the eve of releasing this memorandum, the government has moved for a reconsideration of the Morris/Washington pairing. I defer that issue at present and leave open the possibility that Morris and Washington be tried separately. To the extent the motion for reconsideration seeks to have Washington tried along with Darryl Green and Hart, it is denied for the reasons described above.[25]

## IV. *DEATH–QUALIFIED JURY*

One issue remains that has been raised by the non-capital defendants, Hart and Washington, and by the Court in preliminary proceedings—namely the question of death-qualifying the jury that hears the guilt phase.

The government is plainly entitled to a death-qualified jury to try the question of punishment—whether to impose the death penalty. *Witherspoon*, 391 U.S. at 520, 88 S.Ct. 1770. And since 18 U.S.C. § 3593 as a general rule requires a guilt trial, followed by a penalty trial before the same

---

ing acts or counts relating to defendants other than those in a specific trial. In *DeCologero*, the First Circuit noted that "[i]n principle, the district court could require that DeCologero be tried alone and solely upon the two RICO counts and the RAs [racketeering acts] applicable to him, severing all other defendants and counts for a future trial or trials" as long as those limitations are based on specific and adequate findings. 364 F.3d at 25.

My only conclusion at this stage of the proceedings is that a case with three of these particular defendants, with the particular charges they face, would be unmanageable. The parties will present arguments at a later

date as to the evidentiary implications of Darryl Green/Hart and Morris/Washington trials.

**24.** *See DeCologero*, 364 F.3d 12.

**25.** I appreciate the government's concern in its motion for reconsideration that victims may have to testify in two trials and should I impanel a separate punishment jury, even four. But the problem must be laid at the government's doorstep, not the Court's. The government has chosen to bring this case in federal court, to bring it as a RICO charge, and to seek the death penalty. In short, it has *invited* the complexity with which the Court is dealing.

jury, that has usually meant death-qualifying the guilt jury as well.

But the capital defendants argue that there may be no punishment phase here at all. They have a substantial defense—whether the Esmond Street Posse is a gang at all, and surely whether whatever it is meets the requirements of RICO. While many defendants may make similar claims, these defendants have support for their position in Judge Wolf's findings in *Modlin*. Moreover, even if Esmond Street were found to be a gang and a racketeering enterprise, the defendants' submissions suggest that there will be defenses to the claim that the murders at issue were in furtherance of that enterprise, or motivated by some other concern.[26]

Death-qualification of the punishment jury would add substantially to the time it takes for both joint trials, Darryl Green/Hart on the one hand, and Morris/Washington on the other. The government concedes this fact, although it presents an estimate of two to three weeks that I feel substantially underestimates the time it would take in a case with multiple defendants and counsel. I must pause before devoting such substantial resources prior to the guilt phase when a "not guilty" verdict as to the murder count would render death-qualification unnecessary.

Moreover, death-qualification of the guilt jury raises other important issues. Studies suggest that death-qualification leads to the exclusion of a disproportionate number of black and female jurors. In recent submissions, defendant Morris has presented data to suggest that this phenomenon is particularly apparent in Massachusetts [docket # 186]. Defendant's data preliminarily suggests that African–Americans are under-represented in the jury venire[27] in the Eastern Division of Massachusetts, by as much as half their representation in the community—particularly that 7.8%–9.1% of residents in the Eastern Division of Massachusetts are in whole or in part African–American, that a significantly smaller percentage are included in the jury venire, that in the United States population 48% of black people (but only 22% of whites) oppose the death penalty, and that 45% of Massachusetts voters overall oppose the death penalty. Death-qualifying a jury could significantly deplete the already paltry number of minority jurors in the Eastern District.

This result was clear in *United States v. Gilbert* (98–cr–30044–MAP), where of the 600 people who completed questionnaires, the court conducted voir dire of 203 jurors to qualify sixty-four. Only eight black individuals were voir dired—six opposing the death penalty (75%) and two favoring the death penalty only in special circumstances (25%). *No black jurors were seated.* The result was the same in *United States v. Sampson*, (01–cr–10384–MLW)[28] where of the 498 jurors that completed questionnaires only twenty-three identified themselves as black (4.6%). Of the potential black jurors, ten (43.5%) were opposed to the death penalty, one (4.3%) was in favor of the death penalty, and ten were neutral (43.5%). *No black jurors were seated on the jury.*[29]

---

**26.** *See* FN. 6, *supra.*

**27.** Defendants do not yet have data on the Master Jury Wheel.

**28.** The defense team in *Sampson* also compiled data on gender and attitudes towards the death penalty. Forty-three percent of the women, as opposed to 31.4% of the men were opposed to the death penalty. These numbers indicate a more pronounced differential than nationwide statistics indicating that 30% of women and 22% of men oppose the death penalty.

**29.** These numbers present a stark comparison with the attitudes of potential white jurors who completed questionnaires. In *Gilbert,*

Moreover, similar studies raise the issue of whether death-qualified juries are more conviction prone. *See, e.g.,* Jill M. Cochran, Courting Death: 30 Years Since Furman, Is the Death Penalty Any Less Discriminatory? Looking at the Problem of Jury Discretion in Capital Sentencing, 38 Val. U.L.Rev. 1399 (2004)(citing Herbert H. Haines, Against Capital Punishment: The Anti–Death Penalty Movement in American, 1972–1994 (Oxford Univ. Press 1996); Roger Hood, The Death Penalty A World–Wide Perspective (Oxford Univ. Press, 2d ed.1996); William J. Bowers, The Capital Juror Project: Rationale, Design, and Preview of Early Findings, 70 IND. L.J. 1043, 1053 (1995)); Mark Cammack, In Search of the Post–Positivist Jury, 70 IND. L.J. 405 (Spring 1995). In a state without a death penalty, where forty-five percent of voters are reportedly opposed to it, the phenomenon may be even starker.

To be sure, the Supreme Court has spoken on the issue of death-qualification in the guilt phase in *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), finding that trial before a death-qualified jury did not violate defendant's rights.[30] *See also Buchanan v. Kentucky* 483 U.S. 402, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987)(finding use of death-qualified jury for joint trial in which the death penalty was sought only against one defendant did not violate Sixth Amendment right to impartial jury). Death-qualification of the guilt jury in short, on the record then presented to the Court, did not raise constitutional issues.

But I have a different issue before me than those raised in *Buchanan.* The question here is one of severance under Rule 14, which is not an issue of constitutional entitlement but of discretion, not an issue of rights, but of avoiding prejudice and promoting judicial economy. Here concerns about the fairness of a joint trial because of death-qualification of the guilt jury, merge with other prudential concerns embodied in Rule 14.

The fact that death-qualification of the guilt jury will substantially increase the length of trial, and may not even be necessary at all, coupled with concerns about fairness, suggests that the Court should at least consider other methods of preserving the government's clear right to a death-qualified punishment jury.

170 jurors identified themselves as white, Caucasian, or of European origin—fifty-eight (34.1%) were opposed to the death penalty, fifty-six (32.9%) were generally in favor of the death penalty, and twenty-three (13.5%) approved of the death penalty in certain circumstances. In *Sampson,* 451 (90.1%) identified themselves as white—181 (40.1%) were in favor of the death penalty, 100 (22.2%) were neutral, and 170 (37.7%) were opposed. While I recognize the limitations of these statistics—the small sampling size, the limited amount of data available on the reasons for dismissal, the opinion characterizations created by defense counsel—these numbers give me great pause.

**30.** In *Lockhart,* the defendant offered studies suggesting that juries from which jurors who were opposed to the death penalty were ex-cluded were more "conviction prone" than other juries, studies whose validity the Court questioned but adopted for the purposes of the decision. *See* Judge Nancy Gertner & Judith Mizner, The Law of Juries, Ch. III, part 2(A)(3) (Glasser LegalWorks 1997). The Court held that a jury so selected violated neither the fair cross-section nor the impartiality requirement. The Court held that even if the fair cross-section requirement was applied to a petit jury, as opposed to the jury venire, the group of people sharing a fixed opposition to the death penalty was not a cognizable group within the meaning of the Fourteenth Amendment. Finally, the Court also focused on the jury actually impaneled in *Lockhart* and found there was nothing to suggest that a particular juror was partial. *Id.*

Two methods come to mind: *Method One* involves impaneling a jury to hear the guilt phase in the usual way, without death-qualification, then picking the maximum number of alternates by law (already justified by the length of the trials even with two defendants). Should there be a conviction on Count Sixteen, the Court would then death-qualify the jurors from the first trial, including the alternates, to determine who is qualified to participate in the second trial. If there are not enough jurors to so qualify either Darryl Green in the first trial or Morris in the second, the Court would then discharge the guilt jury and impanel a new jury to hear punishment issues.

*Method Two* involves an order at the outset that for various case management reasons, the Court will impanel a different punishment jury if there is a conviction.

The government argues that the latter option is not available for a number of reasons. The first is statutory: The statute, 18 U.S.C. § 3593, provides that the capital hearing "shall be conducted—(1) before the jury that determined the defendant's guilt," or "before a jury impaneled for the purpose of the hearing if the jury that determined defendant's guilt was discharged for good cause." 18 U.S.C. § 3593(b). As such, the government states that there is no authority for the proposition that the court can decide in advance to discharge the guilt jury before the sentencing hearing for "good cause," 18 U.S.C. § 3593(b)(2)(C).[31]

I will address this question more fully after additional briefing by the parties, but a few general observations are in order. First, Method One does not involve any determination in advance. If death-qualified jurors can be found among the jurors from the guilt phase, the terms of the statute will be followed. If none can be found, the jurors will be discharged for "good cause" shown, and the statute will still be followed. To the extent there are issues about merging jurors who have deliberated at the guilt stage, with those who have not, those concerns have been addressed in Rule 24(c)(3).[32]

Second, whatever rights accrue to the defendant under § 3593 or Rule 24(c) can be waived. If the right to appeal from a sentence can be waived, surely § 3593 rights can waived. *See, e.g., United States v. Teeter,* 257 F.3d 14 (1st Cir.2001) (presentence waivers of appeal right are presumptively valid if knowing and voluntary.) In effect, by objecting to death-qualifying the guilt jury, defendants are waiving the provisions of § 3593 that arguably oblige the Court to hold guilt and punishment trials before the same jury.

The government, however, will not agree to waive the provisions of § 3593, nor obviously its rights to a death-qualified jury.

---

**31.** The government cites *United States v. O'Driscoll,* 250 F.Supp.2d 429 (M.D.Pa.2001), for the proposition that "good cause" cannot be determined at the beginning of the case, prior to the first jury returning a verdict on guilt. *O'Driscoll,* however, is not binding on this Court, addresses a different factual scenario, and provides no discussion to support its determination.

**32.** Rule 24(c)(3), Fed.Crim. Pro. provides:
   **Retaining Alternate Jurors.** The court may retain alternate jurors after the jury retires to deliberate. The court must ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged. If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to being its deliberations anew.
   Rule 24(c) was amended in 1999 specifically to allow the possibility of alternate jurors replacing discharged jurors after deliberations have begun. Prior to the amendment, Rule 24(c) explicitly required the court to discharge all remaining alternate jurors when the jury retired to deliberate.

The combination, it suggests, mandates death-qualifying a single jury charged with hearing guilt first, then punishment.

■ The government's position is disingenuous. It has no "right" to a death-qualified jury to hear the question of *guilt;* it has only a right to a death-qualified *punishment* jury. If judicial economy and expedition, defendants' waiver, and fairness point in the direction of deferring death-qualification until after the guilt phase, the government arguably has no standing to challenge it.[33]

Third, *Lockhart* and *Buchanan* only addressed the exclusion of a given viewpoint—feelings about the death penalty, not explicitly the exclusion of a disproportionate number of African Americans and women. While the exclusion of a viewpoint is not constitutionally significant, the exclusion of women and African Americans may well be. Both are plainly cognizable groups under the Fourteenth Amendment. If the net effect of death-qualification—in this Commonwealth, at this point in history—substantially undermines the participation of women and African Americans in the petit jury (and in the case of African-Americans, entirely eliminated them from the petit jury), constitutional concerns may well be raised.

Finally, it is worth noting that Governor Mitt Romney's Council on Capital Punishment, which issued its final report in May, included among its ten recommendations that "[a]t the end of the guilt-innocence stage of the capital trial, if the defendant is convicted of capital murder, the defendant should have the right to request the selection of a new jury for the sentencing stage." Governor's Council on Capital Punishment Final Report, May 3, 2004, available as of July 6, 2004 at http://www.mass.gov/Agov2/docs/5-3-04MassDP ReportFinal.pdf. *See also,* Governor Mitt Romney's Office Press Release: Romney Accepts Findings of Capital Punishment Council, May 3, 2004, available as of July 6, 2004, at http://www.mass.gov/portal/govPR.jsp?gov_pr=gov_pr_040503_death _penalty.xml.

The Council recommended giving a defendant this right to avoid the "insur-

**33.** Indeed, to suggest that § 3593 is a right that the defendant cannot waive is to place this provision on its head. 18 U.S.C. § 3593 was obviously added to the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 et seq., to address the Supreme Court's concerns in *Gregg v. Georgia,* that in a unitary proceeding, deciding both guilt and punishment, the government would be obliged to introduce highly prejudicial evidence (like criminal record) that is not otherwise admissible and that limiting instructions would be inadequate to cure the prejudice to the defendant. The Court noted: "When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifurcated system is more likely to ensure elimination of the constitutional deficiencies identified in *Furman v. Georgia[,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)]." *Gregg v. Georgia,* 428 U.S. 153, 190, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Further, "the concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprized of the information relevant to the imposition of sentence and provided with standards to guide its use of information." *Id.* at 195, 96 S.Ct. 2909. While I recognize that the government has an interest in using one jury for efficiency reasons, *Lockhart,* 476 U.S. at 180–81, 106 S.Ct. 1758, all of the parties in this case have an interest in efficiency that the Court has considered above. The government's interest in avoiding residual doubt arguments at the punishment phase in front of a new jury would also be cured by defendant's waiver.

mountable strategic dilemma" of having to choose between exercising his constitutional right to contest the prosecution's case at the guilt-innocence stage, and credibly expressing remorse at the penalty phase. As the Council noted, having a separate jury for the penalty phase is not unusual—it occurs whenever a death sentence—but not the underlying conviction—is set aside on appeal or by a habeas corpus court, and the prosecution seeks to retry the penalty phase to a new jury.[34]

Nevertheless, I defer the question of death-qualification for additional briefing. Additional briefs are to be filed by August 15, 2004, on this issue.

## V. CONCLUSION

The following lineup promotes fairness and judicial efficiency, enhances the Court's ability to manage these complex trials and accomplishes the following a) severance of Morris from Darryl Green, in both the guilt and punishment phases, b) minimizing prejudice to the non-capital defendants: Darryl Green and Hart tried together (on January 10, 2005), followed by Brandon Morris and Edward Washington (on April 11, 2005) in a single trial or not, depending on the resolution of the government's motion to reconsider, and then Torrance Green (on July 11, 2005).

The Court has set aside blocks of time for the hearing of pretrial motions over the next six months. To the extent that pretrial motions raise joint issues (challenges to the composition of the jury venire, issues concerning death-qualification), the Court will consider them at the same time, in joint proceedings. *See* June 2, 2004, Procedural Order [docket # 162]. To the extent that pretrial motions raise issues unique to each trial (motions in limine

concerning evidentiary issues), the Court will consider them separately.

The Court reserves the following issues until a later date:

1. The review of the government's motion to reconsider the Morris–Washington pairing.

2. A final ruling on the issue of death-qualification until the parties have had an opportunity to brief the issue further. Briefs on this issue are to be filed no later than August 15, 2004.

3. Consideration of the severance of Count Eleven from any Morris trial on the remaining counts.

4. Consideration of the ways in which evidence may be specifically limited in the severed trials.

**SO ORDERED.**

---

34. Moreover, some of the government's concerns about repetitive presentations about resources could be addressed in the old fashioned way—i.e. stipulated summaries of trial evidence.