The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 19, 2021

## 2021COA110

**No. 17CA0534, *People v. Gutierrez* — Crimes — Murder in the First Degree; Criminal Law — Trials — Separate Trial of Joint Defendants; Criminal Procedure — Relief From Prejudicial Joinder**

A division of the court of appeals holds that the joint trial of two defendants charged with first degree murder and conspiracy to commit murder resulted in reversible prejudice. The evidence indicated that the victim was shot with four bullets from the same gun. Interpreting this to mean that there was only one shooter — and thus, one perpetrator — both defendants moved for severance on multiple occasions, arguing, among other things, that their defenses were antagonistic because they both accused each other of being the sole shooter. The trial court disagreed and tried both defendants jointly. The division concludes that this was an abuse

of discretion because to believe one defense meant that the jury had to disbelieve the other.

The division further concludes that the joint proceedings in this case resulted in reversible prejudice because, in addition to the presentation of antagonistic defenses, the trial saw the introduction of voluminous evidence that would likely not have been admissible in a separate trial — and also required numerous limiting instructions — and a great deal of damaging evidence introduced not by the prosecution but by the codefendant.

Court of Appeals No. 17CA0534
Jefferson County District Court No. 15CR1470
Honorable Todd L. Vriesman, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Andrew George Gutierrez,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUSTICE MARTINEZ*
Brown and Graham*, JJ., concur

Announced August 19, 2021

Philip J. Weiser, Attorney General, John T. Lee, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Lynn Noesner, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1    After a two-week trial, a jury found defendant, Andrew George Gutierrez, and his codefendant, John Orlando Sanchez, guilty of first degree murder and conspiracy to commit murder. The defendants were tried jointly, despite numerous pretrial motions to sever. At trial, the prosecution introduced evidence that the victim, Eric Schnaare, was fatally shot four times with bullets from one gun. Both defendants and the prosecution regarded this evidence, considered with the other evidence in the case, as conclusively proving that there was one shooter. Gutierrez denied shooting Schnaare and accused Sanchez of being the sole shooter, and Sanchez similarly denied being the shooter and accused Gutierrez.

¶ 2    In this case, we conclude that Gutierrez's defense was antagonistic to Sanchez's because the two defenses specifically contradicted each other and to believe one defense meant that a jury would *have* to disbelieve the other. We further conclude that the joint proceedings in this case resulted in reversible prejudice because the trial saw the introduction of voluminous evidence that would likely not have been admissible in a separate trial — and also required numerous limiting instructions — and a great deal of damaging evidence introduced not by the prosecution but by the

1

codefendant. The trial court erred by denying Gutierrez's motions for severance, so we reverse his convictions and remand for a new, separate trial.

## I. Background

¶ 3     From the evening of May 13, 2015, through the early morning of May 14, a group was partying at an apartment in Lakewood. The group included codefendants Gutierrez and Sanchez and their families, significant others, and friends. The defendants were affiliated with the gang "Gallant Knights Insane" or "the GKIs." There was some evidence that Gutierrez was the leader of the GKIs.

¶ 4     The defendants brought guns with them to the party. Not long after 6 a.m. on May 14, the victim — Schnaare — arrived at the apartment. Upon entering, Schnaare was fatally shot four times. After the shooting, the partygoers fled the scene.

¶ 5     Prior to the party, the Lakewood police had installed a pole camera outside the apartment as part of an unrelated investigation. Through pole camera footage, the police identified the partygoers, including the defendants. After the shooting, Gutierrez went to a motel with Sanchez's former girlfriend, Amelia Irizarry. Sanchez, meanwhile, traded one of his guns for another, which he and

2

Irizarry later hid when they were arrested. Gutierrez was arrested at the motel after a standoff with the Lakewood police.

¶ 6     Based on the above, Gutierrez and Sanchez were charged with first degree murder and conspiracy to commit murder. Ultimately, the prosecutors argued that the jury could find "either one of these defendants guilty, either as a principal or as a complicitor."

¶ 7     Gutierrez and Sanchez were tried jointly. After a two-week trial, the jury found both defendants guilty as charged. Gutierrez was sentenced to life without parole. This appeal followed.

## II.    Severance and Joinder

¶ 8     Gutierrez contends, among other things, that the trial court abused its discretion by repeatedly denying his motions to sever his trial from Sanchez's.[1] Specifically, Gutierrez argues that he presented a mutually exclusive, antagonistic defense to Sanchez's, and, as a result, he suffered reversible prejudice from a joint proceeding. We agree.

---

[1] Gutierrez also argues that he should have been granted a separate trial as a matter of right. Given our disposition, we need not reach this argument.

## A. Relevant Principles

¶ 9 When severance is not mandatory under section 16-7-101, C.R.S. 2020, the matter is addressed to the trial court's discretion. *Peltz v. People*, 728 P.2d 1271, 1275 (Colo. 1986). We will not disturb a court's ruling denying severance absent an abuse of that discretion and a showing of prejudice to the moving party. *Id.*

¶ 10 Factors that a court may consider when ruling on a motion to sever that does not trigger mandatory severance include (1) whether the number of defendants or the complexity of the evidence will cause the jury to confuse the evidence and law applicable to each defendant; (2) whether, despite limiting instructions, evidence admissible against one defendant will improperly be considered against another; and (3) whether the defenses presented are antagonistic. *People v. Carrillo*, 946 P.2d 544, 550-51 (Colo. App. 1997), *aff'd on other grounds*, 974 P.2d 478 (Colo. 1999).

¶ 11 Although courts around the country disagree regarding "the amount of antagonism sufficient to require separate trials," *People v. Maass*, 981 P.2d 177, 184 (Colo. App. 1998), Colorado case law makes clear that defenses are not antagonistic when one defendant does not base their assertion of innocence on the guilt of the other.

4

*Id.*; *see also People v. Toomer*, 43 Colo. App. 182, 185, 604 P.2d 1180, 1183 (1979) (holding that defenses are not antagonistic when they do not specifically contradict each other); *United States v. McClure*, 734 F.2d 484, 488 (10th Cir. 1984) ("[O]ne defendant's attempt to cast blame on the other is not in itself a sufficient reason to require separate trials."). On the other hand, mutually exclusive or "irreconcilable defenses" could require severance. *Maass*, 981 P.2d at 184. That is, "the acceptance of one defense would tend to preclude the acquittal of the other defendant." *Id.*

B.     Additional Facts and Procedural History

¶ 12    Gutierrez's counsel moved pretrial to sever the cases, arguing, among other things, that the defendants would be raising mutually exclusive and antagonistic defenses. The prosecution filed a written response arguing that a joint trial would serve judicial economy and that separate trials would risk inconsistent verdicts. At a March 2016 hearing, the court found that the motion was premature because the parties had not yet presented their theories of defense. The court opined, however, that even if the parties did raise antagonistic defenses, limiting instructions would cure any prejudice.

¶ 13    After subsequent discovery revealed that there was only one shooter, Gutierrez's counsel filed a renewed motion for severance. At a hearing on the renewed motion, Gutierrez's counsel argued that it was clear, now, that the defendants would be accusing each other of being the sole shooter — thus, the defendants would be prosecuted not only by the State, but also by each other. The court denied severance on the grounds that any prejudice could be cured with limiting instructions.

¶ 14    Between this hearing and the trial, the parties deposed John Paulin, the man who owned the apartment where the shooting took place. Prior to the deposition, Sanchez's counsel expressed concern that the prosecution would elicit a hearsay statement made by Gutierrez to Paulin that would implicate both defendants in the shooting. Because Gutierrez was the declarant, Sanchez's counsel argued that he should be able to impeach Gutierrez's statement by introducing his prior felony convictions. Later in the deposition, Gutierrez's counsel agreed with Sanchez's counsel and added, "I believe that . . . will force Mr. Gutierrez to make a choice between his constitutional rights, his right to a fair trial, as well as his right

6

to remain silent, and his right to confront." Gutierrez's counsel then renewed their motion to sever, which was denied.

¶ 15     At a later hearing, the parties re-raised this issue. Both defendants' counsel explained that they were being placed in the untenable position of having to choose between fully confronting Paulin, or any other witness, and saving their respective clients from the prejudice of having the codefendant's counsel impeach on prior felony convictions. Thus, both Gutierrez and Sanchez moved to sever, which was again denied.

¶ 16     At the end of the hearing, prior to jury selection, the trial court gave the prosecution fifteen peremptory challenges, Sanchez eight, and Gutierrez seven. Later, during jury selection, Gutierrez's counsel argued that Gutierrez suffered prejudice because he had received fewer peremptory challenges than he would have received at a separate trial, and exhausted them before he could strike a juror who expressed a fear of retaliation from gang members. Gutierrez's counsel made a record that she would have struck the juror had she been allowed to and, further, Gutierrez would have received more peremptory challenges had he been given a separate trial.

¶ 17    In her opening statement, Gutierrez's counsel began by arguing,

> Four bullets from one gun, shot by one person. That person was not Andrew Gutierrez.  And Andrew Gutierrez was not an accomplice to the shooting and the murder of Eric Schnaare.

Counsel then asked, "So what happened?"  What happened, counsel later argued, was "John Sanchez [walked] in the door after Mr. Schnaare.  And he immediately . . . starts shooting at Mr. Schnaare: 1, 2, 3, 4 shots, shoots Mr. Schnaare dead."  Then, in his opening statement, Sanchez's counsel argued,

> [I]f you look at the evidence in this case, you're going to see that John Sanchez didn't shoot anyone.  If you listen to all the evidence in this case, you're going to see that the DA's theory that there was a complicity going on here and there was some sort of agreement or conspiracy isn't true.  You will see that the shooter was Andrew Gutierrez.

Sanchez's counsel then reiterated, "There [are] not two shooters, there is one shooter, and evidence shows it's not Mr. Sanchez."

¶ 18    After opening statements, Sanchez's counsel again moved for severance, arguing,

> [A]fter [having] now heard openings to the extent that there was some ruling that we did not have antagonistic defenses, I think [it is]

> pretty clear that there are. Both sides opened that there was one shooter. The prosecution opened that there was one shooter . . . . [I]n order for [Sanchez] to be found not guilty, the jury must find Mr. Gutierrez guilty, and vice versa.

The court again denied severance, but then gave the following limiting instruction to the jury:

> Although the defendants are being tried together, you must consider this case against each defendant separately. Each defendant is entitled to have their case decided solely on the evidence and the law that applies to that defendant.

¶ 19 During trial, Gutierrez's counsel moved for severance twice more. The court denied severance both times. In addition, fifteen separate times during trial, both defendants' counsel either objected or else drew the court's attention to perceived prejudice resulting from the joint proceedings.

¶ 20 In closing argument, Sanchez's counsel reminded the jury that "the physical evidence shows you that there is one shooter." Counsel then went on to highlight the incriminating evidence against Gutierrez and again argued that Gutierrez was the sole shooter. In Gutierrez's closing, his counsel began with, "Four shots from one gun and one shooter. Not Mr. Gutierrez." His counsel

then proceeded to list all of the evidence tending to prove that Sanchez was the sole shooter. At the end, Gutierrez's counsel argued,

> The bottom line is, minus the distractions, is that there were four bullets from one gun and one shooter. That [two witnesses] both told you that it was Mr. Sanchez . . . . Mr. Sanchez is the one who had the motive, and there is [no] actual evidence, aside of intention to cause fear in you and dislike for Mr. Gutierrez, that he actually participated in any way in this shooting.

## C. Analysis

### 1. The Defenses Were Antagonistic

¶ 21    Gutierrez contends that the trial court abused its discretion by failing to sever the trials because his and Sanchez's defenses were antagonistic. The People contend that Gutierrez's defense was not antagonistic to Sanchez's defense, and even if it was, that alone did not require severance. For two reasons, we are persuaded that the defenses were antagonistic.

¶ 22    First, despite the People's assertion to the contrary, Gutierrez did raise a defense that was mutually exclusive of Sanchez's. While it is true that Gutierrez asserted general denial as his stated theory of defense in required written disclosures to the prosecution, it is

10

clear from counsel's opening and closing statements and arguments on motions to sever, as well as the evidence presented at trial, that Gutierrez did more than simply deny involvement. Bolstered by undisputed evidence that Schnaare died from four bullets fired from *one* gun, Gutierrez's counsel argued in his opening and closing statements that not only was Gutierrez unaware of Sanchez's prior conflict with the victim and had no involvement with the shooting, but also that the evidence indicated that Sanchez was the *sole* shooter. Further, not only did Gutierrez's counsel accuse Sanchez of being the sole shooter in arguments, she put on the testimony of two eyewitnesses at the party — Edward Yazzie and Anna Neal — who identified Sanchez as the one who shot Schnaare.[2]

¶ 23    Second, the fact that the prosecution charged Gutierrez with conspiracy in addition to first degree murder, and that one defendant could be complicit with the actions of another, does not

---

[2] We acknowledge that the prosecution also presented Yazzie's testimony that Sanchez shot Schnaare. Our focus for the purposes of whether the defenses were antagonistic, however, is on the evidence and arguments that Gutierrez, not the prosecution, put forward.

11

preclude the conclusion that the defenses were antagonistic.[3]

Relying on *People v. Durre*, 713 P.2d 1344 (Colo. App. 1985), the People argue that Gutierrez's "attempt to make the other look more culpable" was not antagonistic because that would not be a mutually exclusive defense to a conspiracy charge. The People's reliance on *Durre* is misplaced. The defendant in *Durre* appeared to argue that he was just an accomplice to a robbery and that his codefendant was more culpable. *Id.* at 1347. Gutierrez, by contrast, was not arguing to the jury that he was just an accomplice and that Sanchez was more culpable. Rather, he was blaming the entirety of the crime — both the shooting and the planning of it — on Sanchez. Were the jury to believe Sanchez's defense — that Gutierrez was the sole shooter — that would preclude Gutierrez's acquittal. Similarly, were the jury to believe

---

[3] The People point to the prosecution's charging document as evidence that the very nature of the charges against Gutierrez mean his defense was not antagonistic. Again, our inquiry is centered on *the defendants'* arguments and evidence, not the prosecution's. *See United States v. Green*, 324 F. Supp. 2d 311, 325 (D. Mass. 2004) ("The issue is not the position the government takes. The issue is whether a jury will be able to hear the opposing position — the defense theory — and reliably consider all positions.") (emphasis omitted).

Gutierrez's defense — that Sanchez concocted the shooting and carried it out by himself — that would preclude Sanchez's acquittal. Thus, the acceptance of one defendant's defense would preclude the acquittal of the other defendant. *See Maass*, 981 P.2d at 184 (A mutually exclusive, antagonistic defense means that "the acceptance of one defense would tend to preclude the acquittal of the other defendant.").

¶ 24    In sum, considering the record before us, we conclude that Gutierrez put forward a defense antagonistic to Sanchez's.

2.    Gutierrez Suffered Reversible Prejudice

¶ 25    Having concluded that Gutierrez advanced an antagonistic defense, we now consider whether the joint trial in this case resulted in reversible prejudice. We conclude, for four reasons, that it did.

¶ 26    First, one of the concerns regarding the presentation of antagonistic defenses is that a defendant will, in effect, have to defend himself against both the prosecution and his codefendant. *People v. Warren*, 196 Colo. 75, 78, 582 P.2d 663, 665 (Colo. 1978); *see also State v. Vinal*, 504 A.2d 1364, 1368 (Conn. 1986) (noting that a guilty verdict in these circumstances can be the result of the

13

codefendant's efforts just as much as the government's satisfaction of its burden of proof); *Silva v. State*, 933 S.W.2d 715, 719 (Tex. App. 1996) (reversing because "[the] appellant was forced to defend himself not only against the State but against his codefendant as well"). In this case, Gutierrez was confronted with evidence from both the prosecution and Sanchez. Further, Sanchez's evidence more clearly implicated Gutierrez as the sole shooter because the evidence presented by the prosecution focused more on proof that Gutierrez masterminded the shooting.

¶ 27    Specifically, *Sanchez* put forth the following evidence — independent from the prosecution — that tended to implicate Gutierrez:

- A detective testified, while footage from the Lakewood police's pole camera was played, that Gutierrez could be seen putting a gun in his waistband after the shooting.

- While describing a still image from the pole camera footage taken prior to the shooting, another detective testified that Gutierrez could be seen in the photo with a gun.

- Irizarry testified that a police investigator informed her while she was in jail for the shooting that Gutierrez had threatened her.

- Another detective testified that, during his interview with Irizarry, she accused Gutierrez of shooting Schnaare and was afraid for her life for having done so.

- The same detective testified that, during his interview with Paulin, Paulin said he was afraid of Gutierrez and called him a "crazy son-of-a-bitch."

- Two of the arresting officers testified that a seven-hour standoff ensued between Gutierrez and the Lakewood police in which they had to use a negotiator, bullhorns, and projectiles to get him to surrender to the police.

Also, in her closing, Sanchez's counsel argued that the standoff referenced above was proof of Gutierrez's consciousness of guilt.

¶ 28    Additionally, Sanchez's counsel attacked Yazzie's and Neal's credibility after they testified that Sanchez was the sole shooter. Specifically, Sanchez's counsel attempted to get Neal to testify that she and Gutierrez went shopping for a gun in the hours leading up to the shooting. Sanchez's counsel also asked Yazzie numerous

15

questions about Yazzie's prior felony convictions and pending charges. Not only were these attacks detrimental to Gutierrez's case, they also largely eliminated the prosecution's need to impeach Neal and Yazzie given that the prosecution's theory was that Gutierrez ordered the shooting.

¶ 29 Comparatively, the prosecution put on less evidence against Gutierrez, often undermined the evidence introduced by Sanchez that Gutierrez was the shooter, or otherwise implicated Sanchez was the shooter:

- Irizarry, who was the only witness to directly implicate Gutierrez in the shooting, testified that she had a prior relationship with Sanchez and that she was in love with him. Accordingly, it was possible she implicated Gutierrez alone to protect Sanchez.

- Irizarry also testified that when Gutierrez shot Schnaare, he did so "western style" with two guns. This was inconsistent with the undisputed physical evidence and tended to undermine Irizarry's credibility.

- Irizarry further testified that when she and Gutierrez arrived at the motel after the shooting, Gutierrez was laughing and smiling and stated that he "almost cum when he did it."

- Irizarry told an investigator that Yazzie also shot Schnaare. But when the investigator later informed her that forensics had established that there was only one shooter, Irizarry changed her story and accused Gutierrez alone.

- Another investigator testified that, during his interview with Paulin, Paulin stated that on the night of the party he heard Gutierrez and Sanchez having "a discussion about how to get a job done" and putting "cop killer rounds" or "hollow-points" in a magazine. Paulin did not specify whether Gutierrez or Sanchez made these statements.

- Neal testified that she observed Gutierrez and Sanchez having private conversations on the night of the party.

- During and after the party, Gutierrez posted several photos on Facebook showing him flashing gang signs and carrying a gun.

¶ 30    The prosecution also introduced Sanchez's prior statements made to Dustin Durando, a jail inmate with whom Sanchez shared a cell after his arrest. Sanchez purportedly told Durando that he (1)

17

was a member of the GKIs; (2) had a conflict with the victim over his (Sanchez's) guns; and (3) fatally shot the victim. Prior to hearing this evidence, the jurors were instructed that they were to consider it only against Sanchez and not against Gutierrez. Later in closing argument, however, the prosecutor referenced these statements as evidence of both Sanchez's and Gutierrez's motive for the shooting (i.e., because the victim had a conflict with Sanchez, a member of Gutierrez's gang, the victim had a conflict with the whole gang).

¶ 31 The evidence the prosecution put on against Gutierrez was not overwhelming, as the People argue. Importantly, the evidence Sanchez put on added significantly to the overall weight of the evidence against Gutierrez.

¶ 32 Because Gutierrez had to defend himself against two accusers, only one of which had the burden of proof beyond a reasonable doubt, we conclude that Gutierrez suffered prejudice from the joint jury trial. *See United States v. Romanello*, 726 F.2d 173, 182 (5th Cir. 1984).

¶ 33 Our second reason for concluding that the prejudice suffered was reversible is that the joint trial at times prevented Gutierrez

from fully confronting the witnesses against him, and thus from presenting a complete defense. The prosecution sought to introduce Sanchez's statements on multiple occasions. One way in which Gutierrez hoped to impeach the credibility of those statements was to introduce Sanchez's prior convictions under CRE 806. To be sure, Gutierrez was not necessarily prevented from introducing this evidence. However, as Sanchez's counsel explained in pretrial proceedings, doing so would have resulted in Sanchez's counsel introducing Gutierrez's prior convictions as well. Thus, Gutierrez was faced with a prejudicial Hobson's choice between impeaching the credibility of his codefendant's statements and opening the door to his own convictions. Though this situation, as grounds for reversal, has not been addressed in Colorado, we find other jurisdictions' discussions persuasive. *See Silva,* 933 S.W.2d at 719 (concluding that the defendant's inability to introduce impeachment evidence was a factor supporting reversal); *United States v. Sherlock,* 962 F.2d 1349, 1360 n.4 (9th Cir. 1989) (same).

¶ 34    Furthermore, on two separate occasions, Gutierrez's counsel was prevented from going into the details of Sanchez and Schnaare's prior conflict. Specifically, Gutierrez's counsel sought to

introduce the fact that Sanchez and Schnaare were involved in a prior robbery in which Schnaare was supposed to "kill the guys and he didn't, so that's why [Schnaare] kept [Sanchez's] guns." Relatedly, Gutierrez's counsel was also not allowed to elicit from Yazzie that he and Sanchez were once cellmates and that Yazzie was actually closer with Sanchez than Gutierrez, his own brother.[4] The court, based on a pretrial ruling limiting this testimony under CRE 404(b), instructed the jury not to consider any of this evidence because it touched on Sanchez's prior criminal history.

¶ 35    Gutierrez's counsel considered this evidence important because it helped show Sanchez's motive for the shooting and bolstered Yazzie's credibility as Sanchez's accuser.[5]  Apparently the

---

[4] The relevance is the tendency to show that Yazzie — who implicated Sanchez as the sole shooter — did not have a motive to lie to protect his brother because he was actually closer with Sanchez.

[5] The People's argument that this evidence would have bolstered the prosecution's case is unpersuasive.  For one thing, that argument depends on the People's assertion that Gutierrez did not argue Sanchez was the sole shooter, but instead only denied involvement. Gutierrez did argue that Sanchez was the sole shooter; thus the excluded evidence would have tended to prove Sanchez was the sole shooter because he had a motive.  Regardless, the fact that the evidence might have strengthened the prosecution's case is also irrelevant.  *See Green,* 324 F. Supp. 2d at 325.

jury was also concerned about Yazzie's motives. Four times, the jury asked questions of witnesses who could provide more details of the nature of Sanchez and Schnaare's relationship. Each time, the court declined to ask the jurors' questions due to Sanchez's counsel's objection. Though we cannot know for sure whether the excluded evidence would have been admissible at a separate trial, we can say that Gutierrez's inability to present a complete defense in this regard was another example of the prejudicial effect of the joint proceeding.

¶ 36     We pause briefly to address the People's reliance on *Zafiro v. United States*, 506 U.S. 534 (1993). Interpreting Fed. R. Crim. P. 14, which is substantively identical to our rule, the Supreme Court held that "[m]utually antagonistic defenses are not prejudicial *per se.*" *Zafiro*, 506 U.S. at 538; *see also* Crim. P. 14. It explained that Fed. R. Crim. P. 14 "does not *require* severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *Zafiro*, 506 U.S. at 538-39. It then went a step further:

> [W]hen defendants properly have been joined
> . . . a district court should grant severance . . .
> only if there is a serious risk that a joint trial

21

> would compromise a specific trial right of one
> of the defendants, or prevent the jury from
> making a reliable judgment about guilt or
> innocence.

*Id.* at 539.

¶ 37    *Zafiro* was decided after many of the Colorado cases on antagonistic defenses, and although it is not controlling, it does provide guidance.  It would appear, however, that Gutierrez's case would satisfy the *Zafiro* test.  As we have explained, Gutierrez was denied a specific trial right (the right to present a complete defense), *and* we are not convinced that the jury made a finding of guilt based on the prosecution's efforts alone.  Furthermore, in *Zafiro* the Court was not so much concerned with the precise contours of antagonistic defenses, but rather with when the prejudice stemming from a joint proceeding would require *reversal.*  Thus, *Zafiro* does not change the result we reach today.

¶ 38    Third, during jury selection, Gutierrez received only seven peremptory challenges and was denied an eighth when confronted with a potential juror who expressed concern over retaliation given that the case involved gangs.  The People are correct that the supreme court has concluded the denial of extra peremptory

22

challenges, by itself, does not require severance. *People v. Lesney*, 855 P.2d 1364, 1366 (Colo. 1993). We are not, however, dealing with an argument for severance based on a lack of peremptory challenges alone. Rather, we may consider this fact in conjunction with the examples of prejudice already discussed. *See Eder v. People*, 179 Colo. 122, 125, 498 P.2d 945, 946 (1972) (finding no single example of prejudice dispositive but reversing based on the cumulative effect).

¶ 39 Last, we conclude that the number of limiting instructions given in this case defeats any curative effect they may have had on the prejudice resulting from a joint trial. The People argue, relying on *Zafiro*, that limiting instructions cured any prejudice resulting from the joint proceeding. But here, the jury heard differing iterations of five limiting instructions *twenty-one times* throughout the course of a two-week trial. We need not decide today just how many limiting instructions are too many. What we can say is that, after instructing the jury to limit its consideration of the evidence twenty-one times, any curative power a limiting instruction may have had was lost. *See Bruton v. United States*, 391 U.S. 123, 135 (1968) ("[T]here are some contexts in which the risk that the jury

will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."); *State v. Zadeh*, 226 A.3d 463, 478 (Md. 2020) (ten limiting instructions in a joint trial is a factor indicating prejudice).

¶ 40    Sanchez's counsel summed this case up quite nicely in a pretrial hearing:

> [T]he prosecution has blamed two people for one murder involving what the physical evidence seems to show was one gun involved.
>
> They're throwing the gun in the middle of the room and saying: You guys get a trial together, you figure it out and figure out what's going on.

This gladiator-style trial is not one that we can condone. It is quite clear from counsel's arguments and the evidence presented at trial that Gutierrez's defense was antagonistic to Sanchez's. Further, the prejudice resulting from a joint trial under these circumstances was made clear to the court on multiple occasions. While any one of the instances of prejudice described above might not be sufficient by itself to warrant reversal, we hold that their cumulative effect

does so and requires a new, separate trial. *See Eder*, 179 Colo. at 125, 498 P.2d at 946.

## III. Remaining Contentions

¶ 41 Because we conclude that Gutierrez's first claim of error warrants reversal, we need not reach his other claims, which might not recur on retrial and, even if they did, might arise under different circumstances.

## IV. Conclusion

¶ 42 We reverse Gutierrez's convictions and remand for a new trial.

JUDGE BROWN and JUDGE GRAHAM concur.